**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 11 |
| | § | |
| REMARKABLE HEALTHCARE OF | § | CASE NO. 24-40605 |
| CARROLLTON LP, ET AL.,[1] | § | |
| | § | (Joint Administration Requested) |
| | § | |
| DEBTORS. | § | |

**DECLARATION OF JON MCPIKE IN SUPPORT OF THE DEBTORS'**
**MOTION FOR SANCTIONS AGAINST ALLEON CAPITAL PARTNERS, LLC**

I, Jon Eric McPike, hereby declare under penalty of perjury:

1. I am over the age of 18 and competent to testify as to the matters contained herein.

2. I am the Chief Operating Officer (the "**COO**") of Debtors[2] Remarkable Healthcare in the above-captioned matter.

3. I am authorized to make this Declaration on behalf of the Debtors (the "**Declaration**").

4. I submit this Declaration in support of the Debtors' Motion for Sanctions Against Alleon Capital Partners, LLC (the "**Sanctions Motion**"), Docket No. 3, filed contemporaneously herewith.

5. The Debtors seek the relief set forth in the Motion to ensure the protection of patient health and safety and the Debtors as a going concern because both are currently threatened by

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Remarkable Healthcare of Carrollton, LP (5960), Remarkable Healthcare of Dallas, LP (3418), Remarkable Healthcare of Fort Worth (1692), Remarkable Healthcare of Seguin, LP (4566), and Remarkable Healthcare, LLC (5142).
[2] Capitalized terms not defined herein will have the same definition as those in the Sanctions Motion filed contemporaneously herewith.

1

Alleon Capital's fraudulent and egregious behavior prior to, during, and most importantly following the entry of the Dismissal Order.

6. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees, agents, attorneys, and advisors, the accuracy and completeness of which information I relied upon to provide this Declaration. In my capacity as COO, I have access to and I am familiar with the Debtors' business and the Debtors' business records and books and accounts. I am personally familiar with the Debtors' books and records referenced herein. The facts in the Motion are true and correct within my personal knowledge.

7. If I am called upon to testify at the trial on this matter, I could competently testify as to the facts contained in this Declaration.

8. I make this Declaration based upon my review of Debtors Remarkable Health's records as they are maintained in Remarkable Health's ordinary course of its regularly conducted business activity.

9. In the ordinary course of my employment at Remarkable Health, my duties include communicating with Debtors' Lender, Alleon Capital, and the Debtors' landlord.

10. My understanding of Remarkable Health's recordkeeping practices is based on my authority to access and to review documents in Remarkable Health's possession including loan documents, documents related thereto, and correspondence as part of my job responsibilities.

11. As support for the statements made in this Declaration, I reviewed and relied upon the following business records related to the Loan Agreement with Alleon Capital:

    A. Loan and Security Agreement entered into on or about June 7, 2019 (the "**Loan Agreement**");

B. Guaranty and Security Agreements (the "**Guarantees**");

C. Deposit Account Control Agreements (the "**DACAs**");

D. Second Amendment to the Loan Agreement (the "**Second Amendment**");

E. Third Amendment to the Loan Agreement (the "**Third Amendment**");

F. Forbearance Agreement and Fourth Amendment to Loan and Security Agreement (the "**Forbearance Agreement**");

G. Email between McPike, Rowe, and Castillo, RE: RH (2.14.2024);

H. Email between Klein and Messina, RE: Today's Documents (3.6.2024);

I. Email chain regarding Debtors' Request for Funds (2.27.2024 - 3.13.2024).

J. Emails between Alleon and Debtors about Alleon's Agreement with Compass, RE: Remarkable homes collections (2.21.2024);

K. Emails between Alleon, Debtors, and Compass Alleon won't release funds until Compass is doing all billing, RE: Remarkable homes collections (2.21.2024);

L. Emails regarding Alleon's refusal to release funds for payroll (2.21.24 – 2.23.2024);

M. Emails showing payments made by Debtors after agreement with Alleon;

N. Emails RE: Insurance;

O. Emails RE: Medicare Claims and Compass (1.25.2024);

P. Emails RE: Remarkable Current Status and Proposal (10.2023);

Q. Emails RE: Payroll Release (11.2023);

R. Emails RE: Cash Advance Request Payroll, Concession from Landlord (10.2023);

S. Emails RE: Cash RH Advance Request_loss of employees (2.26.2024);

T. Prepetition Emails; and

U. Spreadsheet showing payments to Alleon and from Alleon to Remarkable.

12. True and correct copies of the above documents are attached to the Motion to Vacate as **Exhibit "A"**, **Exhibit "B"**, **Exhibit "C"**, **Exhibit "D"**, **Exhibit "E"**, **Exhibit "F"**, **Exhibit**

**"G"**, **Exhibit "H"**, **Exhibit "I"**, **Exhibit "J"**, **Exhibit "K"**, **Exhibit "L"**, **Exhibit "N"**, **Exhibit "O"**, **Exhibit "P"**, **Exhibit "Q"**, **Exhibit "R"**, **Exhibit "S"**, and **Exhibit "T"** respectively.

A. THE HISTORY OF THE DEBTORS' BUSINESS

13. The Remarkable Healthcare Debtors were formed in Texas from 2010 to 2013 and operate four (4) skilled nursing facilities in Texas with approximately 270 resident patients. The facilities are located in Carrollton, Dallas, Fort Worth, and Seguin. The Debtors employ approximately 490[3] employees who work in the field and provide general business functions, both on a full and part-time basis, in various capacities to keep the Debtors' business operating successfully and efficiently. Remarkable Healthcare is focused on the individual who needs healthcare services after his/her hospital stay and offers both services to help individuals return home as well as long-term services for those who require extended care. Stabilizing the patient from a clinical, nursing, and social aspect is Remarkable Healthcare's top priority.

B. ALLEON CAPITAL'S RELATIONSHIP WITH THE DEBTORS

14. The Debtors' relationship with Alleon Capital and Alleon Capital's egregious behavior prior to, during, and following the entry of the Dismissal Order is at the crux of many of the Debtors' problems and why the Debtors needed this Court to vacate or amend the Dismissal Order so that the Debtors could refile for protection under this Court's supervision.

15. On or about June 7, 2019, the Debtors entered a Certain Loan and Security Agreement with Alleon Capital ("**Loan Agreement**"), which provided that Alleon Capital would, at its discretion, extend credit to the Debtors to finance the Debtors' business operations. **Exhibit "A"**. The Loan Agreement is guaranteed pursuant to certain Guaranty and Security Agreements

---

[3] On Feb 1st, the Debtors employed 551 persons. As of the date of this filing, due to Alleon's refusal to allow the Debtors access to their cash to pay employees and Alleon's improper taking of the employees' portions of their benefit payments, the Debtors have had 26 employees quit and refuse to return to work. *See* **Exhibit "S"**.

(the "**Guarantees**"). **Exhibit "B"**. Pursuant to the Loan Agreement, Debtors, Regions Bank, and Alleon Capital also entered into certain Deposit Account Control Agreements ("**DACAs**"). **Exhibit "C"**. Pursuant to the DACAs, the Debtors authorized, and Regions Bank is required to complete, a daily sweep of all funds in the Debtors' deposit accounts to be paid to Alleon Capital.

16.   In December of 2022, Alleon changed the way they calculate the Borrowing Base. Rather than the formula in the original Loan Agreement which based the Borrowing Base on accounts receivables, the new formula now involved a three-month average of collections over a thirty-day period. *See* Ex. A. In January of 2023, the Debtors signed an amendment to the Loan Agreement, which was a renewal of the original term of the Loan Agreement (the "**Second Amendment**"). **Exhibit "D"**. The Second Amendment also altered the "Maximum Amount" for the Borrowing Base reducing it from $5,000,000 to $3,000,000. Ex. D at p. 3 § 2.5. These two changes ultimately reduced the Debtors' borrowing base from over $4.2 million to $1.9 million. And, on top of that, the Debtors already had more than the $1.9 million drawn down on the line at the time of this change, but Alleon made a concession that it would ***not*** default on the Debtors.

17.   Shortly thereafter, however, this Second Amendment was amended from its original proposal for the renewal and was changed to the Third Amendment dated February 7, 2023 (the "**Third Amendment**"). **Exhibit "E"**. The Third Amendment also imposed an increased interest to default rate, even though the Debtors' cash flow had temporarily decreased due to industry-specific reasons and despite Alleon having agreed not to default the Debtors. As a result, Alleon created a pull-on cash from the Debtors, cash that the Debtors needed to keep operations cash flowing.

18.   During the second quarter of 2023, the Debtors needed to draw down additional funds on its line of credit because census levels and revenues had not yet returned to pre-COVID levels. But the Debtors could not because any excess line of credit no longer existed. Alleon,

however, agreed to extend up to a limit but imposed egregious penalties in exchange, and the Debtors had no other options but to accept these egregious penalties, which Alleon knew. Alleon's had the Debtors in a chokehold. Indeed, Alleon refused to return collected cash to the Debtors for operations. By withholding cash collections, Alleon was able to force the Debtors to sign the amended agreements that provided for higher fees and higher interest due to Alleon's forced default. *See* **Exhibits "P", "Q", & "R"**.

19. As a result, on or about May 23, 2023, Alleon Capital and the Debtors entered into a Forbearance Agreement and Fourth Amendment to the Loan and Security Agreement (the "**Forbearance Agreement**"). **Exhibit "F"**. On top of the increased interest rate imposed by the Third Amendment, the Forbearance Agreement imposed weekly fees in excess of $35,000.00 even though Alleon knew that the Debtors were not in a position to pay such high fees. *See* **Exhibit "U"**.

20. Nevertheless, the Debtors were able to sustain operations for a few months after Alleon forced us into the new agreements because of the ERC tax credits received from the federal government, which were used to fund payroll and patient care needs.

21. The Debtors used the ERC funds to continue operations and cover the deficits caused by the exorbitant rates in the Amendment through May, June, and July of 2023. To add to Debtors' expenses, although the census had increased by 23% since the end of 2022, the Debtors would not see the increase in revenue from the census increase for a few months because the Medicare Advantage Plans and State Medicaid payments were increasingly delayed due to no government oversight and new federal Medicaid laws related to annual patient eligibility

renewals.[4] Meanwhile, the increase in the census led immediately to the Debtors having additional expenses due to the need to take care of the newly admitted patients.

22. By September of 2023, the Debtors' severe cash flow problems became critical and kept them from being able to pay rent (*See* **Exs. "P", "Q", and "R"**). In October of 2023, Alleon accused the Debtors' officers of taking the ERC funds for their personal use, so the Debtors' officers supplied Alleon with all their personal bank account statements showing that besides their wages, no cash had been taken from the Debtors for personal use.

C. ALLEON CAPITAL'S CONTROL OVER THE DEBTORS

23. Alleon also leveraged its position to control the Debtors' operations causing further harm to the Debtors. For instance, Alleon Capital repeatedly refused to release cash collections for supplies, utilities, payroll, etc., and would only approve cash use for vendors that Alleon deemed important. *See* **Exhibit "T"**. This led to irreparable harm between several of the vendors and the Debtors. *Id*. Similarly, due to Alleon Capital withholding the cash collections from the Debtors, the Debtors were repeatedly late funding payroll, and payroll checks started to bounce, which caused employees, whom the Debtors badly needed to operate, to quit. *Id*. The cash needed to fund payroll existed—Alleon just refused to release it unless we signed the new agreements discussed previously. *Id*.

D. ALLEON CAPITAL'S ACTIONS DURING THE 2023 BANKRUPTCY CASES

24. Ultimately, Alleon's aforementioned actions forced us to file the 2023 Bankruptcy Cases in November 2023. We filed the 2023 Bankruptcy Cases to provide a forum for the orderly and efficient reorganization of our assets, including working to refinance or restructure our debts.

---

[4] The Attorney General is currently investigating Medicare Advantage Plans for their slow pay tactics to healthcare providers.

25. Alleon, however, continued to harm the Debtors during the 2023 Bankruptcy Cases. Postpetition, Alleon participated in a conference call with the Landlord and the Debtors and their counsel regarding the opportunity for the Debtors to enter into the Quality Incentive Payment Program for Nursing Homes ("**QIPP**"), which could net additional revenues of $1.6 million annually starting in the fourth quarter of 2024. On the call, Alleon stated that they would not support the steps necessary for the Debtors' facilities to enter the QIPP unless Alleon was paid off by December 31, 2023. In short, Alleon put itself in control of the Debtors and then impermissibly prioritized their payments over patient care and payroll needs.

26. The Debtors only agreed to the Dismissal of their Bankruptcy Cases due to the advice of their prior counsel who relied on an agreement made with Alleon. As part of the agreement to dismiss the bankruptcy cases, Alleon agreed to allow us to pay interest-only payments of a maximum of $10,000 per week through the end of 2024 to allow Debtors to find a replacement lender to take out Alleon and to ensure patient safety and care. *See* **Exhibit "G"**. Unfortunately, the Rule 11 Agreement was never signed because Alleon later demanded the Debtors use a third-party biller of Alleon's choice, who was affiliated with Alleon—to take over 100% of the Debtors' billing and collections at an unreasonably high and unnecessary expense (plus 8% commissions of all collections (*see* **Exhibit O**)) that ultimately halted any Rule 11 agreement. *See* **Exhibits "J" & "K"**. Nevertheless, our prior bankruptcy counsel, believing that the Rule 11 agreement would be entered, had already moved forward with having the 2023 Bankruptcy Cases dismissed. If Alleon had not agreed to reduce their payment to interest-only payments of $10,000 per week through the end of 2024, the Debtors would not have agreed to the Dismissal. Alleon knew that if Alleon required Remarkable to pay anything more than $10,000 per week, the Debtors could not qualify for new financing to replace Alleon.

27. On January 23, 2024, at the hearing on the Motion to Dismiss, this Court even expressed concern about the Dismissal and warned Alleon in open court that it was concerned that Alleon's behavior would continue and negatively affect patient care. Although Alleon disputes it now, at the hearing before this Court, Alleon's counsel assured Judge Rhoades that the patients would be cared for. **Exhibit "H"**.

### E. ALLEON CAPITAL'S ACTIONS SINCE THE DISMISSAL

28. In January of 2024, Alleon negotiated the Dismissal with the Debtors, and immediately upon the Dismissal it became clear that Alleon was negotiating under false pretenses. Alleon has failed to live up to its bargain. Immediately after Dismissal, Alleon refused to honor the agreement and demanded that our $10,000 per week interest-only payment revert to the full payments required pre-bankruptcy. Additionally, immediately after the Dismissal, Alleon's Managing Partner Leon Chernyavsky informed me that his goal was to so crush the Debtors' business and that I would have no choice but to shutter the Debtors' operations so that Alleon—using Alleon's partner, Compass[5]—could collect and retain all the Debtors' outstanding accounts receivables[6] for Alleon's sole benefit. I tried to explain that shuttering the business meant turning operations over to the State of Texas and Alleon would not benefit from that, but Mr. Chernyavsky was unswayed.

29. Furthermore, Alleon withheld all cash from February 22, 2024 through February 26, 2024 and because payroll was to be paid on February 23, the withholding caused: mass nurse

---

[5] After conceding to employ Compass (but solely to collect aging A/R), the Debtors inadvertently discovered that Compass and Alleon had a side agreement concerning the Debtors' cash collections. Compass had been breaching the confidentiality provisions of their contract with the Debtors by sharing details about the Debtors' collections and A/R with Alleon. When confronted about the breach and informed that the Debtors would take legal action against Compass if they continued to disclose confidential information to Alleon, Compass's response was that Compass and Alleon have their own side agreement relating to the Debtors' cash collections.

[6] We estimate that our uncollected A/R is approximately $5 million. The amount owed to Alleon is in dispute, but Alleon alleges it is roughly $3.7 million.

and med-aid walk-outs, patient harm, threats to the Debtors' licenses, food, and dialysis transportation vendors to refuse services, and the State to issue an IJ for medication reconciliation due to low med-aid staffing (which will result in a fine and reduced ratings). The Debtors were not able to fund payroll on February 23. This is after Regions Bank had the Debtors' accounts frozen while reinstating the DACAs beginning on February 16, 2024. As a result, the Debtors were without critically needed cash from February 16th to February 26th. When we could not make payroll on Friday, February 23rd, we informed our employees that they would be paid by 2:00 p.m. on Monday, February 26th. When Alleon finally released the cash at 4:00 p.m. on February 26th to fund payroll was already three days late and then it was also two hours past when the Debtors were supposed to receive it, and this led additional employees to walk out or resign placing 300 nursing home patients at risk. *See* **Exhibit "S"**. Although Alleon released some cash to the Debtors on February 26th, Alleon still deducted $20,000 on that same day, $10,000 on February 27th, and paid themselves $25,000 on February 29th without notice to the Debtors. *See* **Exhibits "K" & "L"**. Additionally, Alleon required the Debtors to engage Compass before it would give us the funds for payroll.

30. Since Friday, March 1, 2024, Alleon has kept 100% of the Debtors cash for their own use and benefit. As of the date of the filing of the Sanctions Motion, and despite numerous requests (*see* **Exhibit "I"**), Alleon is withholding $951,860.43 from us, which is collections from March 1st through March 13th—and by doing so, we have been unable to use our cash collections to pay critical vendors, buy critical medical supplies, or pay our employees, rent, and other debts in a manageable way that also ensures funds are available to continue to provide the care necessary to protect patient safety and health.

31. Furthermore, despite the Bankruptcy Court's prior warning to Alleon for refusing to release the Debtors' employees' potions of their benefit contributions, Alleon has continued to sweep and has flat out refused to release the employees' contributions to their benefit plans that get collected by us from their employees' paychecks, which we then pay to the applicable provider. **Exhibit N**. At this time, the Debtors' employee benefits have been suspended due to Alleon's refusal to release the funds.

32. Additionally, on or around February 14, 2024, Regions Bank received the court order to reinstate the DACAs that were ceased during the 2023 Bankruptcy Cases. On February 16, 2024, an attorney for Regions Bank notified me that Alleon had been belligerent towards them because the DACAs had not been reinstated yet. Unwilling to deal with Alleon anymore, Regions Bank sent notice to close all of the Debtors' deposit accounts. This further places Alleon's collateral and patient care in jeopardy because the Debtors cannot feasibly move banks and have direct deposits moved to a new bank by Regions Bank's noticed date of termination. The Debtors have requested a ninety-day extension from Regions Bank.

33. As operating entities, the Debtors must continue to collect cash owed as accounts receivable to have the cash flow to take care of patients. But due to the nature of these payments, a large amount of these payments are delayed and "age" before being paid. If Alleon continues to block Debtors' access to the receivables that are paid, the Debtors will have no other choice but to close all four of their facilities. The Debtors have repeatedly explained to Alleon their dire need for the swept cash so that the Debtors may pay for insurance, health benefits, supplies, and utilities, among numerous other things, but Alleon has not even responded to the Debtors past two requests. *See* Ex. H.

11

34. The Debtors only voluntarily agreed to the dismissal of the 2023 Bankruptcy Cases because Alleon Capital agreed to act in good faith and told the Court that they would protect the Debtors' patients. But currently the Debtors and their patients are suffering and in need of dire intervention.

35. At the time the Receivership Application was filed, I was negotiating with Regions to extend the deadline to terminate the Debtors' bank accounts for 90 days. Because Alleon caused Regions to terminate their banking relationship with the Debtors, at the last minute before the emergency hearing on the Receivership Application was to be heard, Alleon agreed to stay the emergency hearing on the Receivership *if Regions gave the Debtors more time to find a replacement bank so that Alleon could get DACAs in place at the Debtors' new bank.* I had already negotiated this extension.

36. After this Court granted the Motion to Vacate and amended the Dismissal Orders, Alleon continued to take the Debtors' cash collections, thereby requiring the Debtors to file this 2024 bankruptcy case.

37. As of the date of the filing of the Sanctions Motion, Alleon has $951,860.43 of the Debtors' cash that is critical for healthcare operations to provide patients the medical services they require and to pay employees to maintain the patients' safety, health, and welfare.

38. Accordingly, on behalf of the Debtors, I respectfully submit that the Sanction Motion be granted.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of March
Dallas, Texas

          Remarkable Healthcare of Carrollton LP
          Remarkable Healthcare of Dallas, LP
          Remarkable Healthcare of Fort Worth, LP
          Remarkable Healthcare of Seguin, LP
          Remarkable Healthcare, LLC

          Jon Eric McPike, Chief Operating Officer