UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 24-40605-btr |
| | § | |
| REMARKABLE HEALTHCARE OF | § | CHAPTER 11 |
| CARROLLTON LP, ET AL.[1] | § | SUBCHAPTER V |
| | § | |
| | § | |
| DEBTOR. | § | (Joint Administration Requested) |

**ALLEON CAPITAL PARTNERS, LLC'S RESPONSE TO DEBTORS' MOTION FOR SANCTIONS AGAINST ALLEON CAPITAL PARTNERS, LLC**

Alleon Capital Partners, LLC ("Alleon") files this Response to Debtors' Motion for Sanctions Against Alleon and respectfully states as follows in support of its response:

## I.    INTRODUCTION

The Debtors' sanctions motion is deficient procedurally, legally, and factually. To the extent that the motion is based on Federal Rule of Bankruptcy Procedure 9011, Debtors failed to provide the requisite notice prior to filing their motion. Further, the Debtors fail to identify any pleading, motion, or other paper signed by Alleon Capital that was filed in violation of Rule 9011.

Factually, as the court saw in Tuesday's hearing, the Debtors' management abused their position by converting receivables and tax credit funds for their own use while lying to their lender.

No other basis exists to grant the motion. The Court's inherent contempt powers require the same actions as Rule 9011. Although the Debtors cite to Bankruptcy Code Section 105, such citation is mystifying in that it lends no authority for this Court to act as requested. Finally, Alleon

---

[1] The Debtors in these jointly-administered chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Remarkable Healthcare of Carrollton, LP (5960), Remarkable Healthcare of Dallas, LP (3418), Remarkable Healthcare of Fort Worth (1692), Remarkable Healthcare of Seguin, LP (4566), and Remarkable Healthcare, LLC (5142).

HB: 4875-1543-1088.1

is a lender. It is not an equity owner. It cannot be compelled to invest into the Debtors nor can it be compelled to enter into new financing. The Debtors' management have made this mess with their incompetence and dishonesty. Now unfortunately, to the Court's point, the patient residents will probably suffer unless action is taken.

To that point, there are two types of people when in crisis: those that look for others to blame and those that seek a solution. Alleon and its counsel are unable to facilitate any solution unless others are seeking one, and not just an externalization of blame. However, notwithstanding that dynamic, Alleon and its counsel have explored solutions. Alleon confirmed with its state court receiver candidate (Karen Nicolau of Harney Partners) that she would serve as a Chapter 11 trustee over the cases. She provided names of companies that can step in as operators of the four facilities. Alleon has provided this information to the Debtors' landlord, who is also looking earnestly for a solution, all with the goal of not leaving the patients without care. Alleon has met virtually with attorneys in the Department of Justice and the Centers for Medicare & Medicaid Services ("CMS") to explain that its court-approved, seven-year-old financing facility is a lawful, normal, ordinary course double lockbox facility used nationally and its use is not in violation of federal regulations (notwithstanding Debtors' representations). Alleon has also spoken with the Texas Attorney General's Office to get them up to speed in the case. These efforts are made because undersigned counsel can see the logistical trainwreck that is nearly here. To attempt a solution, the Debtors need to relinquish their control of a business that they have effectively ran into the ground, as evidenced by this Chapter 11. This Court has the power to displace management and should do so.

However, displacement of management will not solve the financial problems that plague the Debtors. Beginning in 2023, the Debtors sought new financing at least twice, with known

companies conducting due diligence. Those companies refused to fund at an amount sufficient to pay off the Debtors' loan with Alleon. Since Alleon's discovery of the Debtors' conversion of the employee retention credit refunds in July 2023, Alleon has no interest in increasing its exposure, even if the Debtors had ongoing receivables to support a borrowing base. That brings us to the management agreement and its terms, terms that were misrepresented to the Court. There are several moving parts to the agreement: the Debtors transfer 100% of their facilities and operations to the hospital district; the hospital district enters into a sublease with the Debtors (who are tenants to the landlord); and the hospital district then enters into a management agreement with the Debtors. Normally this allows for an increase in reimbursement rates to operate more profitably. Here, that is not the case.

The Court needs to be aware of several aspects of the agreement:

1. The agreement affects all of the Debtors' operations in that ALL revenue is now owned by the hospital district, which makes sense since now the patients are billed under the hospital district's numbers.

2. The Debtors receive enough funds from the hospital district to pay ordinary expenses and the Debtors a 5% commission.

3. The Debtors are solely responsible for ordinary expenses. If the Debtors do not have sufficient funds, they must make up the difference itself, which is problematic because the Debtors have not been currently profitable (much less annually) in over a year.

4. The agreement's mechanism for covering shortfalls through short-term financing has already been lent. That is the $985,000 received on 2/29 and 3/7. Given the Debtors' testimony that no money exists, those funds were apparently spent.

5. The agreement allows the hospital district to recoup its $985,000 out of the Medicaid vendor hold funds that will be issued at some point in the future. Since $985,000 represents roughly what the Debtors get monthly in Medicaid, the vendor held funds will be a wash against the advanced funds. The agreement has no other backstop for facility shortfalls.

6. Unlike the Debtors' representations, Alleon does not get a security interest in the hospital district's receivables. That is prohibited in the agreement. The Debtors can grant a lien on each facility's operating accounts but those amounts are insufficient to secure Alleon's current debt, much less new financing.

7. In sum, the agreement takes away Alleon's collateral base other than what existed as accrued on 2/29. All future receivables are now owned by the hospital district. Without collateral or borrowing base, the Debtors have no chance of financing.

Without reserves and without financing, there is no money to support a Chapter 11 trustee, much less current management. There are no other resources available to the Debtors. Undersigned counsel has worked through the permeations of this case multiple times. No solution comes to light even if all parties cooperated, which they are not. Given the Debtors' choice of litigation over solution, the Debtors are left with no discernable options. Others more capable may come up with solutions, but none is currently apparent, even opaquely apparent. Alleon sees no other realistic option but to close the facilities and transfer the patients in all due haste.

## II.  BACKGROUND FACTS

**A. Alleon Capital has provided Debtors with significant financing to allow their operations to continue.**

Alleon provided advances to the Debtors pursuant to a certain Loan and Security Agreement (the "Loan Agreement") entered into on or about June 7, 2019. The Loan Agreement is guaranteed pursuant to certain Guaranty and Security Agreements ("Guarantees," and together

with the Loan Agreement and all documents executed in connection therewith, the "Security Documents"). Debtors are currently indebted to Alleon in the total amount of $2,976,549.00, not including fees and costs associated with the prior bankruptcy or the current litigation.

To secure the Debtors' present and future indebtedness to Alleon under the Security Documents, the Debtors granted Alleon a security interest in all of the Debtors' present and future accounts, chattel paper, goods (including inventory and equipment), instruments, investment property, documents, and general intangibles, letter of credit rights, commercial tort claims, deposit accounts, the billing reserve cash collateral, and the proceeds thereof (the "Cash Collateral" or "Collateral"). Loan Agreement ¶ 5.1.

Pursuant to the Loan Agreement, Debtors, Regions Bank, and Alleon entered into certain Deposit Account Control Agreements ("DACAs") to secure Alleon's interest in the accounts receivable. Pursuant to the DACAs, the Debtors authorized, and Regions Bank is required to complete, a daily sweep of all funds in the Debtors' deposit accounts to be paid to Alleon. The DACAs set up through Regions Bank represent a regularly seen double lock box arrangement. By this, the government receivables are deposited into a "government" lock box accounts that are fully revocable by the Debtors. There is nothing irregular regarding the set up or control of the deposit accounts held by Debtors. *See In re Missionary Baptist Foundation of Am. Inc.*, 796 F.2d 752 (5th Cir. 1986); *see also* What the Medicare, Medicaid Anti-Assignment Provisions Really Mean, *available at* https://www.buchalter.com/wp-content/uploads/2015/06/Medicare-Medicaid-Anti-Assignment-Provisions.pdf (last visited Mar. 21, 2024).

This is the Debtors' third attempt at reorganizing these facilities. The Debtors first filed for bankruptcy on February 13, 2018. In that bankruptcy, Alleon provided new financing to Debtors for the Debtors' plan of reorganization. The liens and UCC-1 Financing Statements of Comerica

Bank were assigned to Alleon as security for the new financing.

Under the terms of the Security Documents, Alleon would, at its discretion, make advances to Debtors so long as, before and after such advance, the unpaid balance of all cash obligations under the Loan Documents (the "Loan Balance") did not exceed the allowable amount, as defined in the Loan Documents. Debtors were required to pay Alleon, on demand, if the Loan Balance exceeded the allowable amount (an "Over Advance Amount").

Pursuant to the terms of the Security Documents, Alleon provided post-confirmation or "exit" financing for Debtors and otherwise performed all conditions, covenants, and promises required by it on its part to be performed in accordance with the terms and conditions of the Security Documents. Subsequently, Debtors defaulted under the terms of the Loan Agreement and the Security Documents.

**B. Debtors default on their obligations to Alleon Capital.**

On February 4, 2020, Alleon and the Debtors entered into a Forbearance Agreement and Amendment to Loan and Security Agreement (the "Forbearance Agreement"), where Alleon agreed to forbear in the exercise of its rights and remedies under the Security Documents for a time certain if the Debtors, among other things, cured their default and released Alleon of any claims related to or arising from the Security Documents or any advances made to the Debtors.

In early 2023, Debtors requested that Alleon make advances to Debtors in excess of the allowed borrowing base. This request was supported by Debtors expectation that they would receive a tax credit related to the Employee Retention Credit (the "ERC Funds"). Subsequent to the agreement to extend over the ordinary borrowing base by the amount anticipated to be received from the ERC Funds, Debtors received the ERC Funds and deposited those funds in an account outside the agreed upon secured bank account as set forth in the Loan Agreement and the DACAs.

The failure of Debtors to remit the ERC Funds to Alleon created a default because Debtors were unable or unwilling to pay the Over Advance Amount upon demand and Defendants began accruing a penalty (the "Over Advance Penalty"). Debtors continually allege that there was no agreement for these funds to be included in the borrowing base, but indisputably funds were advanced to debtors outside of the formula and in reliance on representations by the Debtors' principals and agents.

On May 23, 2023, Alleon and the Debtors, again, entered into a Forbearance Agreement and Fourth Amendment to Loan and Security Agreement (the "New Forbearance Agreement"), where Alleon agreed to forbear in exercising its rights and remedies under the Security Documents for a specified period under similar terms as the February 2020 Forbearance Agreement.

On November 2, 2023, Debtors filed voluntary petitions on November 2, 2023 (the "Second Bankruptcy Case"), under Chapter 11 of Title 11 ("the Bankruptcy Code"), in the United States Bankruptcy Court, Eastern District of Texas, Sherman Division, under jointly administered Case No. 23-42098 after Alleon refused to fund the Debtors after discovering that the Debtors improperly and deceptively hid receipt of a $394,955.40 ERC refund, a refund previously offered as collateral in exchange for an over-extended position in the Debtors' financing facility.

As of the November 2, 2023, Debtors were in default under the terms of the Loan Agreement because Alleon had demanded on May 18, 2023 that Defendants pay an Over Advance Amount pursuant to section 10.4 of the Loan Agreement, and Debtors failed to do so ("Specified Default"). Debtors were also in default under the terms of the Security Documents because the Debtors failed to cure the Specified Default.

Subsequently, Debtors reached out to Alleon, seeking agreement as to the use of Alleon's Cash Collateral. Debtors entered into a Rule 11 Agreement with Alleon, whereby Alleon agreed to

permit the use of its Cash Collateral if, among other things, Debtors granted replacement liens on all collateral granted to Alleon as adequate protection.

Also, after November 2, 2023, Regions Bank ceased the daily sweep of all funds in the Debtors' deposit accounts for the benefit of Alleon required by the Loan Agreement and DACAs.

On February 9, 2024, the Bankruptcy Case was dismissed with prejudice, prohibiting the Debtors from refiling for 180 days. Pursuant to the Dismissal Order, Regions Bank and Alleon were authorized and directed to reinstate their prepetition DACAs. On March 20, 2024, the Bankruptcy Court entered an Order Granting Partial Relief on Docket 109, Motion to Vacate and/or Revoke Order Dismissing Bankruptcy Cases, in which the Court removed the language providing that the Court dismissed the prior case with prejudice to refiling for 180 days.

On March 21, 2024, the Debtors initiated this, their third bankruptcy proceeding and now seek sanctions against Alleon.

### III.     ARGUMENTS & AUTHORITIES

**A. The Sanctions Motion Should Not Be Decided on an Expedited Basis.**

The Court should not hear the Sanctions Motion on one business days' notice. Pursuant to this Court's local rules, a request for an emergency hearing must involve "an irreparable injury which outweighs procedural due process concerns . . . Abuse of the emergency process may subject parties and/or attorneys to sanctions, contempt, or other disciplinary powers of the Court." Local Rule 9007(b). When sanctions are sought, "due process demands only that the sanctioned party be afforded notice and an opportunity to be heard." *Marriman v. Security Ins. Co. of Hartford*, 100 F.3d 1187, 1191 (5th Cir. 1996). The "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* Moreover, "[a] court must, of course, exercise caution in invoking its inherent powers [to enter sanctions], and it must comply

with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." *In re Cochener*, 360 B.R. 542, 585 (Bankr. S.D. Tex. 2007). While Alleon is not necessarily opposed to the Sanctions Motion being heard on an Expedited Basis, Alleon requests more than twenty-four (24) hours' notice of a hearing that requests more than one million in sanctions against it. The Debtors provided Alleon with one working day to prepare a response to a Sanctions Motion and on a hearing on the same, which requests sanctions of more than one million dollars. During this time, the Debtors' lead counsel was traveling to and from Jacksonville, Florida to argue a summary judgment motion and has not had adequate time to prepare for the Sanctions Motion hearing. Alleon respectfully request that the Court re-set the hearing on the Sanctions Motion to a date during the week of March 25, 2024.

**B. Sanctions Under Rule 9011 Are Procedurally Improper.**

It is axiomatic that before a party files a motion seeking sanctions pursuant to Federal Rule of Bankruptcy Procedure 9011 (or Federal Rule of Civil Procedure 11) that the "[t]he motion for sanctions may not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected . . ." Fed. R. Bankr. P. 9011(c)(1)(A). The Fifth Circuit has made clear that "[c]ompliance with the service requirement is a mandatory prerequisite to an award of sanctions under Rule 11." *In re Pratt*, 524 F.3d 580, 586 (5th Cir. 2008).

Mandatory Fifth Circuit precedent also makes unequivocally clear that informal notice is insufficient, such as notice through "warning letters". *See id.* at 588 ("We may not disregard the plain language of the statute and our prior precedent without evidence of congressional intent to allow 'substantial compliance' through informal service."). In holding that informal notice is

insufficient notice under Rule 9011, the Fifth Circuit quoted the following language from the Tenth Circuit:

> The reason for requiring a copy of the motion itself, rather than simply a warning letter, to be served on the alleged offending party is clear. The safe harbor provisions were intended to 'protect litigants from sanctions wherever possible in order to mitigate Rule 11's chilling effects, formalize procedural due process considerations such as notice for the protection of the party accused of sanctionable behavior, and encourage the withdrawal of papers that violate the rule without involving the district court. Thus, a failure to comply with them should result in the rejection of the motion for sanctions."

*Roth v. Green*, 466 F.3d 1179, 1192-93 (10th Cir. 2006) (internal citations omitted). Because the Debtors did not file their Motion for Sanctions twenty-one days before filing it, the Court lacks any authority to enter sanctions against Debtors under Rule 9011.

**C. Because the Debtors have not established by clear and convincing evidence that Alleon acted in bad faith or willfully abused the judicial process, sanctions under Section 105 are inappropriate.**

Debtors argue that Section 105 of the Bankruptcy Code gives a bankruptcy court the same inherent power to sanction as federal district courts as discussed by the Supreme Court in *Chambers v. NASCO*, 501 U.S. 32 (1991). *See* Mot., Doc 3 at 6 ¶ 20. "[T]he threshold for the use of inherent power sanctions is high." *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir. 1995). "Indeed, the Supreme Court has cautioned that 'because of their very potency, inherent powers must be exercised with restraint and discretion.'" *Id.* (quoting *Chambers*, 501 U.S. at 44).

To enter sanctions pursuant to Section 105 of the Bankruptcy Code, the bankruptcy court must meet this high standard with a finding that there is clear and convincing evidence that the party to be sanctioned engaged in bad faith or willful abuse of the judicial process. *In re Moore*, 739 F.3d 724, 730-31 (5th Cir. 2014) ("nondisclosure and inconsistency, while justifying scrutiny, are not alone clear and convincing evidence of Cadle's bad faith or willful misconduct."); *see also In re Cleveland Imaging & Surgical Hospital, L.L.C.*, 26 F. 4th 285, 297 (5th Cir. 2022) ("Recall

HB: 4875-1543-1088.1

that a bankruptcy court may sanction litigants only if it finds, by clear and convincing evidence, that they acted in bad faith or willfully abused the judicial process."); *see also PrinterOn Inc. v. BreezyPrint Corp.*, 95 F.Supp.3d 658, 713 (S.D. Tex. 2015) ("This inherent power [to enter sanctions] is available only if statutes or rules do not address the conduct and 'only if essential to preserve the authority of the court.'") (quoting *In re FEMA Trailer Formaldehyde Prods. Liability*, 401 F. App'x 87, 883 (5th Cir. 2010)). As the Fifth Circuit similarly stated and made clear "[a] court should invoke its inherent power to award attorney's fees [as a sanction] only when it finds that 'fraud has been practiced upon it, or that the very temple of justice has been filed.'" *Boland Marine & Mfg. Co. v. Rihner*, 41 F.3d 997, 1005 (5th Cir. 1995) (quoting *Chambers*, 501 U.S. at 46). "Moreover, when sanctions are imposed under the inherent power, this court's investigation of legal and evidentiary sufficiency is particularly probing and this court must prove the record in detail to get at the underlying facts and ensure the legal sufficiency of their support for the district court's more generalized finding of bad faith." *In re* Carroll, 850 F.3d 811, 815 (5th Cir. 2017).

While Debtors argue and cite *Chambers v. NASCO* that sanctions can cover conduct "beyond the reach of the Rules" and for "conduct . . . unrelated to positions explicitly taken in court," a close reading of *Chambers* reveals that the Debtors are wrong. *Chambers* actually provides that while "[t]his power reaches both conduct before the court and that beyond the court's confines, for the underlying concern that gave rise to the contempt power was not … merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial." *Chambers*, 501 U.S. at 44. In other words, the alleged disobedience must still bear a relationship to the courtroom proceedings.

It is unclear how Alleon could have, in any way, abused the judicial process or otherwise practiced a fraud upon the Court. In fact, Alleon actively objected to the dismissal of the Debtors' second bankruptcy actions; however, the dismissal was entered over Alleon's objection.

Moreover, it is unclear what action the Debtors actually contend that Alleon took that is sanctionable. A logical reading is that Alleon merely acted within its rights under the DACA Agreements. That the Debtors were frustrated that the DACA Agreements were reactivated after their bankruptcy proceedings were dismissed does not mean that the Debtors can seek to sanction Alleon for exercising the rights bargained for when they made a loan to the Debtors.

**D. Requested sanctions are egregious.**

While Alleon vehemently denies that sanctions are not appropriate here, the sanctions being requested by Debtors are not supported by the law. Bankruptcy courts "must use the least restrictive sanction necessary to deter the inappropriate behavior." *In re Whitley*, 737 F.3d 980, 987 (5th Cir. 2013); *see also In re Carroll*, 850 F.3d at 815 ("Such powers may be exercised only if essential to preserve the authority of the court and the sanction chosen must employ the least possible power adequate to the end proposed."). Here, Debtors are seeking a disgorgement of Alleon's own collateral—funds that they are entitled to—and attorney's fees for an unknown amount of time, for unknown work, and which have not been proven. The Debtors wholly fail to establish that these are an appropriate type of sanction. *See Integrated Claims Sys., LLC v. Old Glory Ins. Co.*, 2020 WL 1027771, at *2 (E.D. Tex. Mar. 3, 2020) (declining to enter sanctions despite party violating two orders because sanctions are "typically reserve[d] . . . for repeated offenders or other flagrant misconduct" and recognizing that "admonitions in this Order are sufficient to induce Seton to comply with this Court's orders."); *see also In re Lopez*, 576 B.R. 84, 93 (Bankr. S.D. Tex. 201) ("Pursuant to a court's inherent authority to sanction for bad-faith,

however, the court's award of attorney's fees 'is limited to the fees the innocent party incurred solely because of the misconduct—or put another way, to the fees that party would not have incurred but for the bad faith.'") (quoting *Goodyear Tire & Rubber Co. v. Haeger*, ---U.S.---, 137 S.Ct. 1178, 1184 (2018)).

## CONCLUSION

WHEREFORE, Alleon Capital respectfully requests that the Court reset the Sanctions Motion for a date and time that provides adequate notice to Alleon Capital, that the Court deny the Sanctions Motion with prejudice, and for such other and further relief to which Alleon Capital has shown itself justly entitled.

Dated: March 21, 2024

HUSCH BLACKWELL LLP
Lynn Hamilton Butler
State Bar No. 03527350
Lynn.Butler@huschblackwell.com
111 Congress Avenue, Suite 1400
Austin, Texas 78701-4093
(512) 472-5456 (Telephone)
(512) 479-1101 (Facsimile)


AND

HUSCH BLACKWELL LLP


By: */s/ Buffey E. Klein*
    Buffey E. Klein
    State Bar No. 24032515
    buffey.klein@huschblackwell.com
    Alejandra Garcia Castro
    State Bar No. 24131325
    Alejandra.garciacastro@huschblackwell.com
1900 N. Pearl, Suite 1800
Dallas, Texas 75201
(214) 999-6100 (Telephone)
(214) 999-6170 (Facsimile)

ATTORNEYS FOR ALLEON CAPITAL PARTNERS LLC

## **CERTIFICATE OF SERVICE**

      I hereby certify that on the 21st day of March 2024, a true and correct copy of the foregoing was served via the Court's ECF system to the parties registered to receive electronic service.

                                            */s/ Buffey E. Klein*
                                            Buffey E. Klein

HB: 4875-1543-1088.1