1              IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE EASTERN DISTRICT OF TEXAS
2                     SHERMAN DIVISION


3   IN RE:                    )  BK. NO:  24-40605-BTR

4                             )  BK: NO:  24-40608-BTR

5   REMARKABLE HEALTHCARE of  )  BK: NO:  24-40610-BTR

6   CARROLLTON; REMARKABLE    )  BK: NO:  24-40611-BTR

7   HEALTHCARE of DALLAS, LP; )  BK: NO:  24-40612-BTR

8   REMARKABLE HEALTHCARE of  )

9   FORT WORTH, LP; REMARKABLE)

10  HEALTHCARE, LLC;          )

11  REMARKABLE HEALTHCARE of  )

12  SEGUIN, LP                )

13

14

15              *  *  *  *  *  *  *  *  *  *

16              TRANSCRIPT OF PROCEEDINGS

17              *  *  *  *  *  *  *  *  *  *

18

19      BE IT REMEMBERED, that on the 22nd day of March, 2024,

20  before the HONORABLE BRENDA T. RHOADES, United States

21  Bankruptcy Judge at Plano, Texas, the above styled and

22  numbered cause came on for hearing, and the following

23  constitutes the transcript of such proceedings as hereinafter

24  set forth:

25


            CINDY SUMNER, CSR (214) 802-7196

1                     <u>I N D E X</u>

2                                                     <u>PAGE</u>

3   <u>JON McPIKE</u>

4       DIRECT EXAMINATION
            BY:  Ms. Boydston                26
5       CROSS-EXAMINATION
            BY:  Mr. Carruth                 52
6
    <u>LEON CHERNYAVSKY</u>
7
        DIRECT EXAMINATION
8           BY:  Mr. Butler                  53
        CROSS-EXAMINATION
9           BY:  Ms. Boydston                55

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CINDY SUMNER, CSR (214) 802-7196

1                    E X H I B I T   I N D E X

2                                        PAGE FIRST REFERENCED

3   Debtor Exhibit 2                          43

4   Debtor Exhibit 7                          29

5   Debtor Exhibit 9                          37

6   Debtor Exhibit 11                         46

7   Debtor Exhibit 12                         46

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2                    COURTROOM DEPUTY:  Remarkable Healthcare of

3    Carrollton, LP, case number 24-40605, motion for joint

4    administration, motion for sanctions, and motion to pay

5    pre-petition salaries and wages.  Remarkable Healthcare of

6    Dallas, LP, 24-40608.  Remarkable Healthcare of Fort Worth,

7    24-40610.  Remarkable Healthcare, LLC, case number 24-40611.

8    And Remarkable Healthcare of Seguin, LP, case number

9    24-40612.  Amended motions for joint administration.

10                   THE COURT:  Appearances.

11                   MS. BOYDSTON:  GOod morning, Your Honor.  Liz

12   Boydston and Alexandria Rahn of Gutnicki LLP on behalf of the

13   debtor.

14                   MR. SALITORE:  Good morning, Your Honor.  Marc

15   Salitore for the United States Trustee.

16                   MR. BUTLER:  Good morning, Your Honor.  Lynn

17   Butler on behalf of Alleon Capital.  And I believe Ms. Buffey

18   Klein is also on the line.

19                   MS. THARPE:  Good morning, Your Honor.

20   Whitney Tharpe with the United States Attorney's Office on

21   behalf of Health & Human Services.  And Ashley Fenton with

22   Health & Human Services is also on the line.

23                   THE COURT:  Thank you.

24                   MS. MILLIGAN:  Layla Milligan out of the Texas

25   Attorney General's Office appearing on behalf of the Texas


                CINDY SUMNER, CSR (214) 802-7196

1  Health & Human Services Commission.  Good morning.

2           THE COURT:  Good morning.  All right.  Any

3  other appearances?

4           MR. KIN:  Good morning, Your Honor.  Richard

5  Kin on behalf of Regions Bank.

6           THE COURT:  I'm sorry.  I did not hear your

7  last name.

8           MR. KIN:  Yeah, Kin, K-i-n, on behalf of

9  Regions --

10          THE COURT:  Richard Kin, thank you.  Okay.

11          MR. CHERNYAVSKY:  Good morning, Your Honor.

12  Leon Chernyavsky from Alleon Capital.

13          THE COURT:  Okay.  Is that everyone?

14          MR. CARRUTH:  Your Honor, Jeff Carruth on

15  behalf of the Kilgore landlords.

16          THE COURT:  Okay.  All right, Ms. Boydston.

17          MS. BOYDSTON:  Good morning, Your Honor.  This

18  is Liz Boydston, again, on behalf of the debtors.  Today

19  we're here on docket number 3, the debtors' motion for

20  sanctions seeking the equitable remedies disgorgement from

21  Alleon.

22      At the May 19th hearing in the prior case the debtor

23  informed Alleon that its interest in the Medicaid accounts

24  receivable remained protected even with the implementation of

25  the QIPP Program and that Alleon remains having a first lien


CINDY SUMNER, CSR (214) 802-7196

1  on all of the debtors' receivables.  The evidence also showed

2  that Alleon had not only swept payroll portions of the

3  employee benefit contributions, but the U.S. Attorney and HHS

4  filed objections saying that Alleon had also swept Medicaid

5  receivables.  Finally, this Court had reminded Alleon of the

6  assurances they had given to this Court regarding patient

7  lives, patient health and safety from the January 24th

8  hearing.  And that the Court expected that the actions that

9  would put patient lives and care as the top priority.  But

10  instead and despite all of these things, the next day on

11  March 20th Alleon still drained $134,842.71 from the debtors'

12  accounts.  And then yesterday, March 21st, post-petition,

13  Alleon improperly took an additional $120,185.48 without

14  seeking from this Court thus in violation of the automatic

15  stay.

16      As of this morning, March 22nd, two days post-petition,

17  Alleon has not returned that $120,185.48 that it took in

18  violation of the automatic stay.  And in total is holding

19  $1,072,045.91.  The debtors did promptly inform Alleon of

20  their stay violation and requested an immediate return of the

21  improperly taken funds.  But, again, as of this morning,

22  those funds have not been returned.  Thus in addition to the

23  relief the debtors are requesting in their sanction motion,

24  we do ask that Alleon's willful violation of the automatic

25  stay be an additional cause for sanctions to be granted

CINDY SUMNER, CSR (214) 802-7196

1    against Alleon.

2        At the conclusion of the March 19th hearing in the

3    prior case, counsel to debtors, myself, conferred with

4    counsel to Alleon, Ms. Buffey Klein, and invited a deal that

5    if Alleon would return the debtors' cash, at least enough to

6    make today's mandatory payroll by noon, the debtors would

7    delay any bankruptcy filing.  Unfortunately no response was

8    made to that offer.  Alleon's refusal to return the cash and

9    Alleon's continued taking of the debtors' cash after the

10   March 19th hearing forced the debtors to file their

11   bankruptcy cases and request this emergency hearing seeking

12   disgorgement from Alleon as an equity remedy under Section

13   105 in order for the debtors to quickly be able to pay their

14   employees which much be paid today by noon.

15       Instead of working with the debtors, Alleon appears

16   from its own objection filed last night to have spent the day

17   meeting with various government agencies, which explains why,

18   as Mr. McPike will testify today, that the debtors were

19   alerted late yesterday afternoon that the State of Texas is

20   sending out representatives to each of the debtors' four

21   facilities today to ensure that paychecks are delivered

22   timely, otherwise the State is taking over the facilities.

23       The relief requested today is critical.  It's necessary.

24   And without this relief, there will be irreparable harm to

25   the employees, the patients, and the debtors' more than ten


                    CINDY SUMNER, CSR (214) 802-7196

1  year business.  Alleon and counsel for Alleon have refused to

2  fulfill the assurances they previously made to this Court.

3  And on top of that, Alleon has continued total disregard for

4  the welfare of the patients and employees.  Allowing conduct

5  such as Alleon's here to go unpunished sets a precedence that

6  values dollars over cents -- and cents, excuse me, over the

7  lives, health, welfare, and safety of the patients, the

8  residents, and the employees to provide the care necessary to

9  keep those patients alive.

10      The debtors do request this Court to sanction Alleon

11  under Section 105 of the Bankruptcy Code for misleading the

12  Court about its care and concern for the patients and

13  residents, for the harm that is being occurred to the

14  patients and potentially to the employees if they are not

15  paid today.  And most importantly for complete disregard of

16  human life and just caring about its bottom line.  And

17  additionally for Alleon's willful violation of the automatic

18  stay.

19      Would the Court like me to start going into evidence,

20  or would you like me to wait for the others to make their

21  statement?

22          THE COURT:  I'm just going to take opening

23  statements first before I hear any evidence.

24          MS. BOYDSTON:  Okay.  For all these reasons --

25          THE COURT:  Is that the conclusion of your --


CINDY SUMNER, CSR (214) 802-7196

1          MS. BOYDSTON:  Yes, Your Honor.

2          THE COURT:  Okay.  Thank you.

3      All right.  Anybody else wish to make an opening

4  statement in support of the debtors' position?

5      All right.  Let me hear from all of the other parties.

6  Let's start with Alleon.

7          MR. BUTLER:  Yes, Your Honor.  Lynn Butler on

8  behalf of Alleon Capital.  I'm somewhat taken back by the

9  opening, but let me explain.

10     The -- about 1:00 yesterday we found out that Regions'

11  sweep had not been turned off.  We immediately contacted

12  Gordon Green who is counsel for Regions.  And within I would

13  say about an hour and a half, those sweeps were reversed.  So

14  120,185.48 was returned to the bank accounts by which they

15  were received.  We notified Mr. Gordon -- I mean Mr. Green of

16  that to be returned.  So that was not something we did

17  intentionally.  The sweeps had not been turned off.  We also

18  asked Regions Bank to make sure that they were turned off

19  permanently, and they are.

20     But as to the rest, if you had a chance -- and I know

21  we filed it late, Your Honor, but it's been an interesting 48

22  hours.  If you had a chance to look at the response, those

23  first couple of pages kind of spell it out.  What we should

24  be here today is on a cash collateral or a financing motion.

25  But there's nothing left in the estate to effectuate either


                    CINDY SUMNER, CSR (214) 802-7196

1  one of those.  Their sanctions motion, we pointed it out at

2  the last hearing.  They point to no order for a Rule 11

3  Agreement that was broken.  Now it's instead of the agreement

4  that was made at the dismissal, which we thoroughly disagreed

5  at the last hearing, now they're saying we made a comment

6  that we were concerned about the patients.  Well, in that

7  vein, Your Honor, we were.  And let me tell you what we got.

8       Over the last 48 hours, immediately after the hearing,

9  we reached out to our State Court Receiver candidate, Karen

10  Nicola, and asked if she would consider being a Chapter 11

11  Trustee.  She confirmed she would.  We then went to the

12  landlord and asked the landlord if he had a mechanism to help

13  take over operations.  He's looking into it.  Ms. Nicola gave

14  us names of operating companies in Texas that could move

15  quickly.  Those research -- that research and discussions are

16  ongoing.

17       After that, Your Honor, based on years of experience

18  representing healthcare debtors, reached out to the

19  Department of Justice and HHSC.  We spoke with Ms. Stark,

20  Ms. Fenton, and Daniel Wolf of CMS OIG to walk through our

21  financing facility to see if they had any concerns.  And we

22  told them what we felt of the condition of the debtor.

23       Lastly, yesterday afternoon, I had an opportunity to

24  talk with Ms. Milligan.  I've been on both sides of this

25  where patients are in imminent danger.  Things have to work

CINDY SUMNER, CSR (214) 802-7196

1    quickly.  The day of the dismissal hearing, not the entry of

2    the order, the day of the dismissal hearing the debtors

3    should have been looking for a solution.  And they haven't

4    looked for a solution.  All they've done is waste time

5    throwing bombs at us.  But the reality is this, and this is

6    the stark reality.  The terms of that agreement were

7    misrepresented to the Court.  That agreement wholly transfers

8    all operations, period.  All of those receivables from March

9    1st forward belong to Wes Wharton.  The only thing that the

10    agreement allows the debtor to encumber, if it needs

11    financing, is the operation accounts and its 5 percent fee

12    from Wes Wharton.  But when they're bringing in roughly 1.3

13    to 1.5 million a month from all sources, that 5 percent is

14    not sufficient to repay existing debt of Remarkable, much

15    less support any additional financings.

16        And keep in mind, Your Honor, what the testimony was.

17    Wes Wharton paid them at the beginning of March $985,000

18    after the last week in February where Alleon funded nearly

19    $450,000.  Their average take a month is 1.3 to 1.5.  They

20    told you on Tuesday they're out of money.  I don't know

21    what's going on.  But financially this debtor has nothing

22    left.  They can throw bombs at us, legally insupportable

23    bombs.  But it's not solving the problem.  And now the

24    problem has gotten so bad, I'm not sure it can be solved.

25        As to the motion itself, under Rule 11, as the Court

CINDY SUMNER, CSR (214) 802-7196

1  pointed out, there's no identifiable violation Alleon

2  committed at all.  We acted on a defaulted facility

3  post-dismissal, but not even until March 1st when we knew for

4  sure they no longer had a facility.  As to 105, that's clear

5  and convincing standards.  As (indecipherable word) as the

6  motion is, it's not -- it doesn't support any sanctionable

7  conduct in any way, shape, or form.  And quite frankly, Your

8  Honor, if the Court felt that it truly did, we need to have a

9  live evidentiary hearing.

10       But with that, Your Honor, I deny the motion.  We don't

11  oppose the wage motion.  We don't know where the money is

12  going to come from.  And, of course, we don't oppose the

13  joint administration.

14            THE COURT:  Okay.  All right.  I'll hear

15  opening from any other party.

16            MR. CARRUTH:  Your Honor, Jeff Carruth on

17  behalf of the landlords.

18       We don't oppose the wage motion, except to the extent

19  we put in our objection that there should be no salaries paid

20  to any of the McPike family at this point.

21            THE COURT:  Okay.

22            MR. CARRUTH:  We voiced some other concerns in

23  our motion -- our objection.  But as to the wages, itself,

24  that's where we are.

25            THE COURT:  All right.


                CINDY SUMNER, CSR (214) 802-7196

1          MR. SALITORE:  Good morning, Your Honor.  Marc

2     Salitore for the United States Trustee.

3          THE COURT:  Yes, sir.

4          MR. SALITORE:  I just very briefly wanted to

5     update Your Honor.  Mr. Weisbart has agreed to serve as a

6     Subchapter V Trustee.  Given the deterioration and the

7     debtors' apparent financial condition between the last set of

8     cases and this set of cases, the U.S. Trustee has asked

9     Ms. Boydston to support the eligibility of the debtors under

10    Subchapter V.  Ms. Boydston has agreed to provide information

11    to support that eligibility.  Given the immediacy of the

12    issues that we face today, we expect that to be resolved

13    within the next week.

14         The U.S. Trustee has also reached out concerning a

15    patient care ombudsman.  Ms. Goodman, you may recall, served

16    in the last set of cases.  Ms. Goodman has declined to serve

17    in these cases and we are in the process of trying to

18    evaluate a patient care ombudsman situation.  All of that is

19    simply by way of background.

20         Thank you.

21         THE COURT:  Thank you.

22         All right.  Anyone else wish to make an opening?

23         All right.  Since no one else wishes to make an

24    opening, Ms. Boydston, let's -- you may proceed.  But let's

25    be clear about what we're doing for purposes of today.  I do


                    CINDY SUMNER, CSR (214) 802-7196

1    not have a motion in front of me for a motion to use cash

2    collateral.  I have the joint administration, sanctions, and

3    payment of pre-petition wages.  So first, why don't we start

4    with the pre-petition wage issue.  And I'd like to understand

5    before you call your first witness how much it is that you

6    are looking for, totals, in order to keep your doors open and

7    take care of the patients for right now.  Since this is an

8    emergency hearing, I'm only going to consider matters that

9    will require immediate attention.  To the extent it can wait

10   for a more fulsome, live hearing, that's what we're going to

11   do.  Okay.

12            MS. BOYDSTON:  Yes, Your Honor.

13            MS. RAHN:  Your Honor --

14            MS. BOYDSTON:  Ms. Rahn is going to -- was

15   going to handle the wages.

16            THE COURT:  Okay.  Was somebody else going to

17   speak?

18            MS. RAHN:  Yes, this is Ms. Rahn.  I was going

19   to give you the amounts for the wages.

20            THE COURT:  All right.

21            MS. RAHN:  So what is immediately needed is to

22   fund payroll today is the $635,679.28.  And then for the stub

23   period of March 18th and 19th, which is also pre-petition,

24   there's an additional approximately $105,389 for a total of

25   $741,068.33.


                    CINDY SUMNER, CSR (214) 802-7196

1              THE COURT:  Okay.

2              MS. RAHN:  So -- but what is absolutely needed

3    is the $635,679.28.  And without that number, we won't be

4    able to make payroll.

5              THE COURT:  And how are you planning on -- do

6    you have 635,000?

7              MS. RAHN:  No, Your Honor.

8              THE COURT:  Okay.

9              MS. RAHN:  Because our accounts have been

10   repeatedly swept.

11             THE COURT:  I understand your position.  But

12   my question is, I don't have a motion in front of me for use

13   of cash collateral.  So I'm just trying to understand, if you

14   get Court authority to use -- I mean to pay the pre-petition

15   payroll, where's the money going to come from?

16             MS. RAHN:  Your Honor, we are relying on the

17   sanctions motion and getting money back from the -- from

18   Alleon.

19             THE COURT:  Okay.  Am I missing something

20   here?

21        Even if you were to prevail, which I'm not saying you

22   will -- even if you were to prevail, isn't the,

23   quote/unquote, money you get back their cash collateral, or

24   is it not?

25             MS. RAHN:  It arguably is not since they took


                    CINDY SUMNER, CSR (214) 802-7196

1  so many -- well, yes, it is, but it also isn't because a lot

2  of the money they took constituted Medicare and Medicaid and

3  all of the other things that they weren't supposed to be able

4  to sweep.

5            THE COURT:  So you're saying some of the money

6  was not cash collateral?

7            MS. RAHN:  And we're also asking for the

8  authority to be able to use that money that we get back to

9  pay the wages motion.

10            THE COURT:  Where are you asking for that?

11            MS. RAHN:  The sanctions motion, but also in

12  the wages motion.

13            THE COURT:  Okay.  Can you tell me where in

14  the pleadings you --

15            MS. RAHN:  I'm going to refer to Ms. Boydston

16  on the sanctions motion.  She's more familiar with it.

17            MS. BOYDSTON:  Yes, Your Honor.  We filed the

18  sanctions motion specifically to request the authority to pay

19  employee payroll.  And if you look at the sanction motion at

20  paragraph -- oh, it's in the employee wages.  In the sanction

21  motion we asked to disgorge and in the employee wages motion

22  we asked for the authority to use the funds to pay for it.

23  So in the sanctions motion we ask for the disgorgement of the

24  money to be put in the operating account this morning.  And

25  then additional relief that the Court deems just and proffer.

1  We did not get any agreement on cash collateral.  I have

2  requested the relief from cash collateral yesterday from

3  Mr. Butler and I got -- and Ms. Klein and I got no response

4  from Mr. Butler and Ms. Klein said that she would talk to her

5  clients and I received no response from them.  And so it

6  would have to be ordered against them because of the

7  sanctions motion.

8            THE COURT:  Okay.  That's not what I'm asking.

9  I'm asking you where in your pleadings do you ask to use

10  their cash collateral, use the funds to the extent that

11  they're disgorged or returned by Alleon to pay the

12  pre-petition wages?  I'm looking -- the issue is notice.

13  Okay.  So can you show me where that is?

14            MS. BOYDSTON:  It's in paragraph 45 of the

15  wages motion.  Paragraph 45 of the wages motion, to avoid the

16  potential of such liability and because the (inaudible word)

17  obligation is not property of the debtors' estate, debtors

18  request that the Court order Alleon to disgorge at least

19  $951,000 plus additional amounts Alleon improperly swept.

20  Such funds shall be returned to the debtors' operating

21  account by no later than when this hearing started.  And

22  authorize debtors to remit those amounts to the appropriate

23  parties in the ordinary course of business.

24            THE COURT:  Okay.  Why is it not property of

25  the estate?

CINDY SUMNER, CSR (214) 802-7196

1          MS. BOYDSTON:  It is property of the estate.

2          THE COURT:  Well, paragraph 45 says it's not

3    property of the estate.

4          MS. BOYDSTON:  Oh, I don't know why that not

5    is in there, it must have been -- I do know we have been

6    literally working around the clock on this.  That's a

7    mistake, I apologize.  I don't know why it says that.  I

8    don't know why it says, are not.  It should say, are property

9    of the estate.

10        Your Honor, in order for the debtors to be able to make

11   payroll, just as was stated -- and I'm asking the Court to

12   take judicial notice of the March 19th hearing and all of the

13   testimony therein.  In order to make the payroll, we have to

14   have the money that Alleon took.  Mr. McPike --

15         THE COURT:  Okay.  I -- okay.  I understand

16   you need the money.  There's -- I think everybody understands

17   that.  I'm just trying to understand the legal basis for

18   which the Court can grant that motion and then we'll take the

19   evidence in just a moment.  But --

20         MS. BOYDSTON:  I mean, part of the legal basis

21   is 105, Your Honor.  And --

22         THE COURT:  So --

23         MS. BOYDSTON:  I'm sorry, go ahead.  I

24   apologize.

25         THE COURT:  You keep -- you may proceed.


                 CINDY SUMNER, CSR (214) 802-7196

```
 1              MS. BOYDSTON:  Okay.  So, and as this Court
 2   knows, this is a Court of equity.  And we are standing here
 3   today, you know, (inaudible word due to flipping of paper in
 4   the phone) irreparable harm if that happened.  Mr. McPike
 5   will testify that everything Mr. Butler said is absolutely
 6   incorrect.  And in our exhibits that we shared last night,
 7   the email as requested, and then filed this morning just in
 8   case, all of it bears a full signed Wes Wharton management
 9   agreement.  Every single thing that Mr. Butler is saying is
10   an incorrect reading of that management agreement with Wes
11   Wharton.  They absolutely have a first lien on the
12   receivables.  What he doesn't understand and what Mr. McPike
13   will testify to is that the debtors bring in more than a
14   million dollars a month.  They bring in almost two million
15   and some months more than two million.  Only one million of
16   that is Medicaid, which is the only thing that the Wes
17   Wharton QIPP Program does -- works with at all.  That's it.
18   And I've attached a bunch of different exhibits.  One from
19   the State of Texas QIPP Program so that everybody can
20   understand that QIPP only affects Medicaid.  That's it.
21   Medicare is completely different.
22        So everything that the debtors --
23              THE COURT:  Okay.  Is counsel -- hold on.  Is
24   counsel for Wes Wharton present?
25              MS. BOYDSTON:  No.  I could not get counsel
```

CINDY SUMNER, CSR (214) 802-7196

1    for Wes Wharton to go on since they're in a hearing right

2    now.  Trent Krienke is in a hearing right now.

3                    THE COURT:  Okay.  So you are suggesting the

4    Wes Wharton contract only affects Medicaid --

5                    MS. BOYDSTON:  Yes.

6                    THE COURT:  -- receivables?

7                    MS. BOYDSTON:  Yes.

8                    THE COURT:  And --

9                    MS. BOYDSTON:  It affects Medicaid --

10                   THE COURT:  Hold on.

11                   MS. BOYDSTON:  All Medicaid receivables.

12                   THE COURT:  I'm just trying -- okay.  I'm

13   trying to understand your position, so just one moment, okay.

14          You are suggesting that the Wes Wharton deal only

15   affects Medicaid receivables.  All of the other receivables

16   belong to the debtor, generated by the debtor.  Is that -- is

17   that your position?

18                   MS. BOYDSTON:  Kind of.  Okay.  Every single

19   receivable, period, belongs to the debtor.  The Medicaid

20   receivables go through Wes Wharton because -- through the

21   QIPP Program.  They come into Wes Wharton and then Wes

22   Wharton pays them over to the debtor, the Medicaid

23   receivables.  And then based on monthly metrics, then gives

24   the debtors an increase and incentives if they meet certain

25   metrics of care.  So the purpose of the QIPP Program is not


                    CINDY SUMNER, CSR (214) 802-7196

1    to reduce the Medicaid receivables a SNF, a skilled nursing

2    facility receives.  It's to increase it.

3         And on the exhibits that I attached, on Exhibit

4    Number -- Exhibit Number 10 is Wes Wharton's attorney, Trent

5    Krienke, stating in a public article that QIPP is critical

6    for nursing homes because Medicaid is the lowest rate in

7    Texas and the QIPP Program makes up for the shortfall by

8    giving incentives to any skilled nursing home that's in the

9    QIPP by increasing their Medicaid receivables.

10        So the argument and the truth is that Alleon's --

11   Alleon's collateral is increased, okay.  Alleon gets the full

12   lien on all of the Medicare receivables and private pay,

13   which is what Alleon has swept.  The million dollars plus

14   that Alleon has swept in 21 days, that is Medicaid --

15   Medicare and private pay receivables only.  There is no

16   Medicaid in that because that is held up by the CHOW right

17   now, which is why Wes Wharton gave the line of credit to

18   compensate for that -- for those Medicaid receivables, which

19   as of today was more than a million dollars.  And then there

20   should be another payment coming in next week, I think.

21   Mr. McPike will be able to tell us.  Next week, I think, from

22   Wes Wharton for the rest of the month Medicaid receivables.

23   So the total that the debtors would have collected this month

24   is more than a million dollars which Alleon swept which is

25   Medicare and private pay only plus the $900,000 that Wes

1  Wharton has provided to replace the $900,000 in Medicaid
2  receivables that the debtors would have collected but for the
3  CHOW.
4      In the docket Exhibit Number 7, the Wes Wharton
5  management agreement, I highlighted all of the different
6  things in there to counter what Mr. Butler is saying.  They
7  simply just do not understand what the QIPP Program is.  It
8  is -- there's no (indecipherable word) at all against a
9  lender taking a lien, or a mortgage, or a preexisting lien or
10 mortgage in any of the QIPP receivables because they are
11 Medicaid receivables only and they are not affected by the
12 Medicare anti-assignment law.
13     They are acting on mistake.  They do not understand the
14 QIPP Program.  And because of their mistake, they are going
15 to end up shutting the facilities down.  It is imperative
16 that that money come back, go to the debtors' employees so
17 that they can take care of their patients.  And we can sit
18 down and they can understand -- we'll sit down with
19 Mr. Krienke and have them --  have him explain it.  Because
20 this is what almost every single SNF in Texas joins to
21 increase their revenue by 15 plus percent, depending on
22 census.  And Mr. McPike testified on the 19th and will
23 testify again today that their census is increasing, which
24 means even more money for Alleon.
25     Can I call my first witness, or should I -- or can I

1   clarify anything more for the Court before I call my first

2   witness?

3                    THE COURT:  You may call your first witness.

4                    MS. BOYDSTON:  Mr. McPike, can you please --

5                    THE COURT:  Again, let me tell you -- hold on.

6   I'm limiting you to only those issues that need to be

7   addressed today on an emergency basis, okay.

8                    MS. BOYDSTON:  Correct.

9                    THE COURT:  Which relates to your request for

10  wages -- the pre-petition wage motion, right?  And everything

11  else we're going to take up at a different day after the --

12  after the parties have a little bit more notice and we can

13  have a more fulsome hearing.

14                   MS. BOYDSTON:  Can I get clarity on that,

15  because I'm trying to understand what that means?  Because

16  without -- there is -- there's less -- there's less --

17  there's $16,000 in the bank account.  So if the Court is

18  not --

19                   THE COURT:  I thought there was 120,000?

20                   MS. BOYDSTON:  No.  As of this morning when I

21  asked my client to please check and send me the AR, the check

22  register, the money had not been returned in there.  So if

23  it's in there, it must be tied up in Regions.

24                   THE COURT:  Okay.  Well, you all can sort that

25  out in just a moment.  But you may --


                    CINDY SUMNER, CSR (214) 802-7196

```
 1              MS. BOYDSTON:  It shows 120 --
 2              THE COURT:  As I've said --
 3              MS. BOYDSTON:  I understand that.  My question
 4   though is, what do I -- if we're not going to consider the
 5   disgorgements, there is no money to pay it.  And if there is
 6   no money to pay it, then the State takes over the facilities
 7   today.  So if I can't address --
 8              THE COURT:  Again, if you -- I'll allow you to
 9   go forward on the, quote/unquote, disgorgement.  I frankly
10   don't see what their mistake is -- you know, I don't
11   understand the impact of your allegation that they are --
12   they don't understand or misunderstand the QIPP Program.
13   And, you know, we'll take that up.  But I'm simply going to
14   take up only those matters that are absolutely necessary for
15   today.  Anything else that can wait needs to wait until
16   everybody has more notice.  So if that involves getting money
17   from Alleon through disgorgement or otherwise, I'll take --
18   I'll hear you.  Again, I'm very concerned about the notice
19   issue, but we'll take that up too.  But I'll hear your
20   evidence.
21              MS. BOYDSTON:  Okay.  The debtor -- okay.
22   Alleon has had notice, because I -- we -- I filed this motion
23   at least (inaudible word), so they had notice.
24              THE COURT:  Well, there is no motion -- there
25   is no motion for use of cash collateral.  I don't see one.
```

CINDY SUMNER, CSR (214) 802-7196

1          MS. BOYDSTON:  No, there isn't one.

2          THE COURT:  And in bankruptcy --

3          MS. BOYDSTON:  There isn't one.

4          THE COURT:  Right.  There you go.  So we'll

5    take -- you say there's a paragraph in one of the -- you say

6    there's a paragraph in one of the pleadings that asks for

7    disgorgement and use of those funds.  I -- I don't know that

8    that's sufficient, but I'll take a look at it and I'll hear

9    you in your closing.  I'll hear your evidence now given that

10   you've already made your opening.

11         MS. BOYDSTON:  Okay.  Mr. McPike, please --

12   please take your mute off so that we can chat and so that the

13   Court can swear you in.

14         MR. McPIKE:  Yes, ma'am.

15         (The witness was sworn by the courtroom deputy.)

16         THE COURT:  All right.  Just so we're clear,

17   Mr. McPike, we're not chatting.  This is a hearing in court

18   and you are testifying under oath.  Do you understand that?

19         THE WITNESS:  Yes, ma'am.

20         THE COURT:  Thank you.

21      All right.  You may proceed, Ms. Boydston.

22

23

24

25              (no omission)


CINDY SUMNER, CSR (214) 802-7196

1                    <u>JON McPIKE</u>

2   The witness, having been duly sworn to tell the truth,

3   testified on his oath as follows:

4                    <u>DIRECT EXAMINATION</u>

5   BY MS. BOYDSTON:

6       Q.   Mr. McPike, can you please state your name for the

7   record.

8       A.   Jon McPike.

9       Q.   Can you please inform the Court what you do for the

10  debtors?

11      A.   I'm the chief operating officer.

12      Q.   How many employees do you have today?

13      A.   516 today.

14      Q.   And today how much exactly do you need to be able

15  to pay the employees?

16      A.   Today for payroll we would need $635,679.28 of our

17  cash collections.

18      Q.   And where are those cash collections?

19      A.   Alleon is holding them.

20      Q.   What are those cash collections that Alleon is

21  holding?  What are the receivables that make them up?

22      A.   Medicare payments, Medicare Advantage Plan

23  payments, and private pay payments.

24      Q.   Did you hear Mr. Butler state earlier that the

25  debtors only make a million dollars a month?

1      A.    I'm sorry, could you repeat that?

2      Q.    Did you hear Mr. Butler state earlier that the

3  debtors only make a million dollars a month?

4      A.    I did hear that, yes.

5      Q.    And is that true?

6      A.    No, it's not.

7      Q.    How much -- how much would the debtors have

8  collected through today if Alleon had not swept the funds?

9      A.    Month to date, that would have been -- we would

10  have collected month to date, not including 3/20 and 3/21, we

11  would have collected so far 1.6 million 600 -- $1,600,619.25.

12  And since then, I believe, there's another over 120,000, or

13  maybe even another 120 on top of that that would be on top of

14  that.

15      Q.    So if -- if the $120,000 is back in your account at

16  the end of this hearing, how much money does the debtors have

17  in their bank accounts right now?

18      A.    If they added the 120 mil -- 120,000 back from

19  yesterday, we would have $136,000 available to us of our cash

20  that we've collected.

21      Q.    Before March 1st -- before March 1st, how much

22  was -- were you paying Alleon per month on your interest and

23  principal payments?

24      A.    We were paying $10,000 a week and then we -- Alleon

25  also swept approximately $37,000 for legal fees.


CINDY SUMNER, CSR (214) 802-7196

1      Q.    So is it -- is it out of the ordinary that in three

2    weeks Alleon has swept more than a million dollars?

3      A.    It's not out of the ordinary that they swept it.

4    It's out of the ordinary that they kept it and are not

5    returning it to operations.

6      Q.    What does Alleon say -- have you requested the

7    money back?

8      A.    Numerous times, yes.

9      Q.    And why aren't they sending the money back?

10     A.    Because they have a misunderstanding of the

11   agreement --

12            MR. BUTLER:  Objection, Your Honor.

13   Objection, Your Honor.  It's speculation.

14            THE COURT:  Objection sustained.

15     Q.    What is -- what is your understanding?  Why do you

16   think that Alleon is not -- is not giving you the money back?

17     A.    Well, Alleon has stated to us in a formal email

18   that they're not returning the money because they believe

19   their cash collateral no longer exists because they have a

20   misunderstanding of the agreement with Wes Wharton believing

21   that their cash collateral --

22            MR. BUTLER:  Objection, Your Honor.

23     A.    -- is gone and that belongs to Wes Wharton.

24            MR. BUTLER:  Objection, Your Honor.  The

25   agreement speaks for itself.


                CINDY SUMNER, CSR (214) 802-7196

1            THE COURT:  The Wes Morland (sic) agreement?

2            MR. BUTLER:  Yes, Your Honor, Wes Wharton.

3  It's Wharton, Texas, Wes Wharton.  Yes.

4            THE COURT:  Okay.  The agreement says what it

5  says.  But he's simply testifying about his understanding.

6  I'm not sure about the relevance of that.  But that's what

7  he's testifying about.

8       I'm going to overrule the objection, okay.

9       Q.   Mr. -- Mr. McPike, can you -- do you have in front

10 of you Exhibit Number 7, the Wes Wharton agreement?

11      A.   Yes, I do.

12      Q.   Can you scroll through it and see if it is the

13 true, executed, and final document?

14      A.   Yes, it is.

15      Q.   Can you please go to page 12, Section 2.3.2?

16      A.   Page 12 --

17      Q.   I'm sorry, page 12, 2.3.3, apologies.

18      A.   Yes, I'm there.

19      Q.   Can you read the -- the -- right after, provided

20 however?

21      A.   The manager may pledge a security interest in the

22 facility operating account as collateral for working capital

23 or HUD financing obtained in the manager or prime lessor's

24 name.

25            MR. BUTLER:  Objection, Your Honor,


                CINDY SUMNER, CSR (214) 802-7196

1    completeness.  If you look at the decretal Section 2.3 it

2    says, manager shall not pledge or provide a security interest

3    in any of the assets of the Hospital District provided,

4    however, the manager may pledge a security interest in the

5    facility operating account, as noted in our objection is

6    collateral.  The facility operating account is used to fund

7    the operation.  It doesn't get them anywhere.

8              THE COURT:  Okay.

9              MS. BOYDSTON:  May I continue, please?

10             THE COURT:  You may.

11      Q.    Okay.  Who -- who was the manager in the agreement?

12      A.    Remarkable Healthcare.

13      Q.    And does this agreement define what the facility

14   operating account is?

15      A.    I'm not sure.

16      Q.    If I -- if I take you to -- to the provision of

17   this document that defines it, paragraph 6.1 -- I'm sorry,

18   paragraph 7.2, page 23, is it in there?

19      A.    I'm scrolling.  Page 23, yes.

20      Q.    Do you -- is it true that the 7.2, the paragraph,

21   is what was added to in the March 19th hearing in your prior

22   case?

23      A.    Yes.

24      Q.    The highlighted portions are -- can you see the

25   highlighted portions?

1      A.   Yes.

2      Q.   Do you see the first highlight, subject to a prime

3   in (inaudible word)?

4      A.   Yes.

5      Q.   Can you read the beginning of that sentence?

6      A.   The prime (indecipherable word) account shall be

7   the sole and exclusive property of the Hospital District

8   subject to requirement by any lender or any mortgage

9   encumbering the facility.

10      Q.   Is there already a lender encumbering these

11   facilities?

12      A.   Yes.

13      Q.   Who is that lender?

14      A.   Alleon Capital Partners.

15      Q.   Are there mortgages encumbering these facilities?

16      A.   Yes.

17      Q.   So have you spoken with Wes Wharton about Alleon's

18   lien on all of the assets encumbering these facilities?

19      A.   Yes.

20      Q.   Did you inform Alleon of the status of their liens

21   on these facilities after conversations with Wes Wharton?

22      A.   Yes.  And I even tried to set up a phone call

23   between the Wes Wharton counsel and Alleon principals and I

24   was told that would be a waste of time.

25      Q.   So look at the next highlighted portion.


                CINDY SUMNER, CSR (214) 802-7196

1      A.    Yes.

2      Q.    Can you read -- can you read that highlighted

3  portion?

4      A.    Manager and Hospital District shall develop a cash

5  management system that provides for transfer of ordinary

6  revenue from the deposit account to an (inaudible word)

7  account (inaudible words due to audio cutting out) full and

8  exclusive property of manager or its affiliates no less often

9  than weekly or more frequently if agreed to by the parties.

10     Q.    And is that facility operating account the one that

11 has the Medicaid receivables in it?

12     A.    It would have all of the receivables in it, yes.

13     Q.    And who has a first lien on all of those

14 receivables?

15     A.    Alleon does.

16     Q.    Can you read the last (inaudible few words due to

17 shuffling of papers into the phone)?

18     A.    Notwithstanding the full billing to secure the

19 payment and performance of Hospital District's obligation to

20 lender, the Hospital District hereby grants to manager a

21 continuing security interest and a lien upon the depository

22 account, the accounts and the proceeds thereof whether now

23 owned or hereafter created, acquired, or (inaudible word).

24     Q.    Okay.  And that word, depository account, can you

25 scroll back up to page 23 and --


CINDY SUMNER, CSR (214) 802-7196

1      A.    Yes.

2      Q.    -- tell us what that depository account is?

3      A.    All total net revenue derived from the operation of

4  the facility shall be deposited in a designated account which

5  shall at all times be segregated from other funds of the

6  Hospital District, that is the depository account.  The

7  depository account shall be the sole and exclusive property

8  of the District subject to requirements by any lender or

9  mortgage encumbering the facility.

10     Q.    Okay.  So what is your understanding from your

11 speaking with Wes Wharton and from your experience of what

12 that means?

13     A.    My understanding of this is that all of the

14 accounts receivables that are generated from the Remarkable

15 Healthcare facilities remain the property of Remarkable

16 Healthcare for us to use if we have to get a loan such as the

17 one that we have with Alleon.  Therefore, the collateral

18 remains in tact.  Josh Kilgore, who is our landlord,

19 understands this.  He's tried to explain this.

20           MR. BUTLER:  Objection.  Objection.

21     A.    Every skilled owner -- every skilled owner in

22  Texas --

23           THE COURT:  Hold on.  There's an -- there's an

24 objection pending.

25           MS. BOYDSTON:  Hold on.  Hold on, Jon.


CINDY SUMNER, CSR (214) 802-7196

```
 1                    THE WITNESS:  I'm sorry.

 2                    THE COURT:  Stop speaking over people.

 3                    THE WITNESS:  So sorry.

 4                    THE COURT:  Who's objecting and what's the

 5     basis?

 6                    MR. BUTLER:  Lynn Butler, Your Honor, hearsay.

 7                    THE COURT:  Thank you.

 8                    MR. BUTLER:  He's testifying what the landlord

 9     understands.

10                    THE COURT:  Objection sustained.

11          Q.   So is it your understanding that Alleon has a first

12     lien security interest in all of the debtors' receivables, no

13     matter the QIPP Program?

14          A.   Everything that they have collateralized right now

15     remains in tact regardless of the Wes Wharton agreement and

16     in the Wes Wharton agreement which supports that, just like

17     every other skilled nursing facility in the United States

18     that have entered the QIPP Program with a hospital partner.

19     And all of their lenders understand this, except for our's.

20     And the reason that's important --

21                    MR. BUTLER:  Objection, Your Honor.

22          A.   -- is because that is their reason --

23          Q.   Okay, Jon.

24                    THE COURT:  Okay, objection sustained.

25                    MR. BUTLER:  Yeah.
```

CINDY SUMNER, CSR (214) 802-7196

1          MS. BOYDSTON:  I didn't hear what the

2   objection is, I'm sorry.

3          MR. BUTLER:  Nonresponsive, repetitive,

4   irrelevant.

5          THE COURT:  Objection is sustained.

6     Q.   Okay.  Okay.  Mr. McPike, can you move to page 31,

7   paragraph 16.1?

8     A.   Yes.

9     Q.   Do you see the highlighted portion?

10    A.   Yes.

11    Q.   Can you read that, please?

12    A.   No consent shall be required for manager to grant a

13   security interest in this agreement to a lender.

14    Q.   Did you discuss this with Wes Wharton about Alleon?

15    A.   Yes.  And they assured me -- I'm sorry, go ahead.

16    Q.   What -- what did you take from that, that meeting?

17   What is your understanding from that meeting with Wes Wharton

18   about Alleon's position with the security interest?

19    A.   That the accounts receivable of the companies

20   remain secure for Alleon's cash collateral and for their --

21   the collateral used to secure their line of credit remains in

22   tact.

23          MR. BUTLER:  Your Honor, objection --

24   objection.

25          THE COURT:  Objection -- objection is --


                CINDY SUMNER, CSR (214) 802-7196

1   objection is sustained.

2       Ms. Boydston --

3            MS. BOYDSTON:  Yes.

4            THE COURT:  -- his understanding is

5   irrelevant.

6            MS. BOYDSTON:  Your Honor, I don't --

7            THE COURT:  Unless you can tell me there's

8   some reason his understanding is relevant, it is not

9   relevant.  So I'm allowing you some leeway, but this --

10  that's all you're testifying -- all he's testifying to so

11  far.  And his understanding is not relevant to any

12  determination this Court needs to make.

13           MS. BOYDSTON:  I understand that, Your Honor.

14  And I'm -- on the 19th you said we had to look at a document

15  and the final document wasn't there.  I have now -- we've now

16  uploaded the document.  The document speaks for itself.  And

17  there it plainly states that there's --

18           THE COURT:  Well, you can make whatever legal

19  argument -- okay.  You can make whatever legal argument you

20  want to make from it.  But I do not need this witness to be

21  testifying to this Court about what he thinks it means.

22           MS. BOYDSTON:  Okay.  I did want to get it

23  into evidence.  I'm offering Exhibit 7 into evidence.

24           THE COURT:  Exhibit 7.  Any objections?

25           MR. BUTLER:  Hold on, Your Honor.  Let me pull


                CINDY SUMNER, CSR (214) 802-7196

1    up the debtors' -- if you can give me one second.  Exhibit 7,

2    executed -- no objection to the admission.  Objection to the

3    highlight.  But whatever it says what it says.

4             THE COURT:  Okay.  Well, the highlights just

5    highlight language, right?  The objection --

6             MR. BUTLER:  Sure.

7             THE COURT:  -- you don't object to the -- to

8    the exhibit.  So Exhibit 7 then is admitted.

9             MR. BUTLER:  Thank you, Your Honor.

10            THE COURT:  Thank you.

11            MS. BOYDSTON:  Thank you.

12       Q.   And, Mr. McPike, can you pull up Exhibit Number 9?

13       A.   Yes.

14            MS. BOYDSTON:  Your Honor, this is -- because

15   this is a telephonic hearing, I provided an email to

16   everybody the actual link to this official Texas HHS QIPP

17   website because I can't pull it up for the Court.  Our office

18   screenshot it, the first page of it.

19       Q.   But, Mr. McPike, can you look at Exhibit 9?

20       A.   Yes.

21       Q.   Have you been to this website before when you were

22   investigating the QIPP Program?

23       A.   Yes.

24            THE COURT:  What exactly is Exhibit 9?

25            MS. BOYDSTON:  Exhibit 9 is a screenshot of


                    CINDY SUMNER, CSR (214) 802-7196

1  the QIPP Program website.  And the link is in the -- is in

2  the email that I sent, because this is not a virtual hearing

3  where I could pull it up to verify that this is the official

4  website.

5           THE COURT:  So it's just the screenshot that

6  you're putting into evidence?

7           MS. BOYDSTON:  Well, I'm about to ask him a

8  question about it, yes.

9           THE COURT:  Okay.  Well, you can ask him

10  questions about it.  But I'm not quite sure what the -- well,

11  I'll hear what the question is, I guess.  But --

12      Q.   Mr. McPike --

13           MS. BOYDSTON:  Sorry, Your Honor.

14           THE COURT:  You may proceed.  You may proceed.

15      Q.   Mr. McPike, are you looking at Exhibit 9?

16      A.   Yes.

17      Q.   Earlier today you testified that the QIPP Program

18  receivables that -- I'm sorry, the QIPP Program only accounts

19  for Medicaid receivables.

20      A.   That's my understanding.

21      Q.   And what is -- what is your understanding based off

22  of?

23      A.   Just the research that I've done and the other

24  owners that I've talked to before we made the decision to go

25  into QIPP.

CINDY SUMNER, CSR (214) 802-7196

1      Q.    Did you use this website, the official State of

2   Texas Health & Human Services website when you were

3   researching --

4      A.    Yes.

5      Q.    -- about the QIPP?

6      A.    Yes.

7      Q.    Is this page that I screenshotted here one of --

8   the main page of the QIPP Program?

9      A.    Per Texas Health & Human Services, yes.

10     Q.    Can you --

11           MR. BUTLER:  Objection; relevance, Your Honor.

12     Q.    Can you read what's --

13           MR. BUTLER:  Your Honor, relevance.

14           THE COURT:  What is the relevance of this

15   (inaudible word due to shuffling of papers)?

16           MS. BOYDSTON:  This is to provide evidence to

17   back up my argument and Mr. McPike's statement to the Court

18   that the only portion of the QIPP -- the only portion of the

19   proceeds under receivables that are affected by the QIPP are

20   the Medicaid portion.  Just so you're not just taking our

21   word for it, so there's actual evidence.

22           THE COURT:  There's actual evidence of --

23   explain that to me one more time.

24           MS. BOYDSTON:  So we are disputing, because of

25   our argument, that Alleon has the information incorrect.


                CINDY SUMNER, CSR (214) 802-7196

1  That they believe that they do not have their -- their lien

2  on any of the receivables.  We have already -- I have already

3  in my argument explained that the QIPP only affects Medicaid

4  receivables and this website, which is a Texas Health & Human

5  Services official website about the QIPP Program clearly

6  shows that it's only for Medicaid Managed Care Program.  And

7  it doesn't affect any others at all.  And I want to be clear

8  that it --

9              THE COURT:  Okay.

10             MS. BOYDSTON:  -- is not --

11             MR. BUTLER:  Your Honor --

12             THE COURT:  That's a --

13             MR. BUTLER:  -- if I could speak?

14             THE COURT:  Yes.

15             MR. BUTLER:  And, Your Honor, I'm -- if you

16 look at the front page of their agreement that was entered

17 into evidence, it says that this is a sub-lease agreement and

18 operations transfer of all of the operations at the facility.

19 The -- all the total net revenue, as we went through on

20 Tuesday, all net revenue -- it doesn't -- there's no

21 exclusion of other revenue.  And I wish we had Wes Wharton

22 here, I really, really do, because the agreement speaks for

23 itself.  Every dollar generated by operations at that

24 facility are covered by the agreement.

25     I would be more than happy if I could stay -- say today

CINDY SUMNER, CSR (214) 802-7196

1  that we have a lien on everything post-March 1st and Wes

2  Wharton agrees to that.  That completely colors this a

3  different way.  But the agreement defines things.  And

4  facility, the facility -- Remarkable is a tenant.  The

5  facility is defined as the real estate, the location.  And I

6  think Mr. Carruth would probably -- his client would probably

7  get mad if you allowed a mortgage to be placed on that

8  facility.

9            MS. BOYDSTON:  Objection, Your Honor.  I

10 mean -- objection.  Objection --

11           THE COURT:  Stop both of you.

12           MS. BOYDSTON:  -- argument.

13           THE COURT:  Okay.  Stop.  Stop.  Stop.  Stop,

14 both of you.  Okay.

15      You all are making legal arguments about what the

16 agreement says and does not say, okay.  Okay.  And clearly

17 you all have a difference of opinion about what the agreement

18 does and does not say.  But I don't understand what's the

19 relevance of that for purposes of today?  Whether -- whether

20 Alleon got it right or wrong, they -- they have refused to

21 fund.  Okay.  So now what?

22           MS. BOYDSTON:  The -- the relevance, Your

23 Honor, is that we are asking for sanctions because they are

24 acting retaliatory because they do not understand this.

25 Because they got mad that they -- that the debtors entered

1    into the QIPP Program, they have --

2                  THE COURT:  I understand.

3                  MS. BOYDSTON:  -- 100 --

4                  THE COURT:  I understand your position, okay.

5    I understand your position.  My question is, what is -- what

6    is it that they are obligated to do that they didn't do under

7    your agreement that I can enforce?  What is this,

8    quote/unquote, tension for?  For their misunderstanding?

9                  MS. BOYDSTON:  It's for -- it's for misleading

10   the Court.  It's for putting themselves ahead of everybody.

11   It's for retaliating against the debtors.  It is for bad

12   faith, for bad conduct.  It is -- it is for all of the things

13   that they're doing that they're doing in retaliation.  They

14   are not doing it because they are in their right to do it.

15   They're doing it because of retaliation.  They do not

16   understand.  They are putting the life and safety of patients

17   at risk because they do not understand this document and they

18   are retaliating against the McPike's.  They said to you in

19   their opening --

20                  THE COURT:  Okay.  Hold on.  And you think you

21   can get all of that for a motion for sanctions?

22                  MS. BOYDSTON:  Yes.  Yes, Your Honor, I do.

23   Yes.  Under 105, yes.  I -- I do.  The Supreme Court -- I can

24   make my argument now, or I can wait until the end.

25                  THE COURT:  No.  I'll --


                  CINDY SUMNER, CSR (214) 802-7196

```
 1              MS. BOYDSTON:  Yes, Your Honor.

 2              THE COURT:  -- I'll hear it.  I'll hear your

 3   oral -- I'll hear your arguments at the end.  I just want to

 4   understand where you're headed.  So you're going to provide

 5   me with evidence about why it is that Alleon got it wrong.

 6   But that's a legal question, right?  So whether they got it

 7   right or wrong is a legal question as to whatever these

 8   documents say, whatever the agreements are, whatever the law

 9   is about QIPP, right?

10              MS. BOYDSTON:  Yes.  I guess it is -- yes, it

11   is a legal argument.

12              THE COURT:  Okay.  Then I don't know what the

13   factual basis for it is.  I mean, I understand both of you

14   have a difference of opinion about the law and what the

15   agreement is.  But I'll hear you at closing.  I don't think I

16   need any further evidence from this particular witness about

17   why it is Alleon got it wrong.

18              MS. BOYDSTON:  Okay.

19              THE COURT:  So why don't you move it along.

20              MS. BOYDSTON:  Okay.  I'll move it along.

21        Q.   Mr. -- Mr. McPike, can you -- can you open Exhibit

22   Number 2?

23        A.   Yes.

24        Q.   What is Exhibit Number 2?

25        A.   Okay.  Exhibit Number 2 is the cash that has been
```

1   swept from our Regions deposit accounts to Alleon February

2   29th --

3       Q.   And --

4       A.   -- to March 1st.

5       Q.   -- the (inaudible word due to speaking as the same

6   time as the witness)?

7       A.   Yes.

8       Q.   And what is the total at the bottom?

9       A.   $1,072,045.91.

10       MS. BOYDSTON:  Your Honor, I admit this into

11  evidence as the number that they are holding.

12       MR. BUTLER:  Your Honor, one, foundation.

13  Two, and I apologize, I can't open this pdf for some reason

14  on my laptop.  The -- and I'm trying, I swear I'm trying.

15    But as far as foundation, where did it come from?  The

16  source documentation.  How was it created?  All of that kind

17  of stuff.

18       THE COURT:  Okay.  I'm going to sustain the

19  objection on foundational grounds.  But if you can't open the

20  document, I'm not sure how --

21       MR. BUTLER:  I know, Your Honor.

22       THE COURT:  -- we're going to do this.

23       MR. BUTLER:  Believe me, I'm panicking on --

24  I'm panicking on what's next.

25       MS. BOYDSTON:  This was also filed on the

1  docket, which I believe you filed a notice -- a notice for.

2          MR. BUTLER:  I'll keep trying, Your Honor.

3  They can go on.

4          THE COURT:  Okay.  What's the docket number?

5          MS. BOYDSTON:  It is docket number -- docket

6  number 21.

7          THE COURT:  Okay.

8      Mr. Butler, perhaps you can look there.

9          MS. BOYDSTON:  Docket number 21-1, Exhibit 2.

10     If Alleon wants to stipulate to the number being 1,000

11 (sic) 72,000 $45.92 since March 1st, then that's fine.  But

12 that's all this is for.

13         MR. BUTLER:  Absolutely not, Your Honor.

14         THE COURT:  It's what number?

15         MS. BOYDSTON:  1,000 72 -- $1,072,045.91.

16         THE COURT:  Okay.

17     Q.   Mr. McPike, what did you create this document from?

18     A.   Directly from the wire transfers to Alleon from the

19 Regions bank account.  The I Treasury screen.

20         MS. BOYDSTON:  Again, I -- I would like to

21 offer this into evidence.  All it is is showing every single

22 one of the wire transfers and the dates that the wire

23 transfers -- that is it.

24         THE COURT:  Mr. Butler.

25         MR. BUTLER:  Sorry, Your Honor.  I

CINDY SUMNER, CSR (214) 802-7196

1   (indecipherable two words).

2        Your Honor, normally -- my client is trying to verify

3   right now by text, but normally we would put in the source

4   documentation that make up the actual charge.  They're

5   looking at it.  And I will -- if you -- if the Court will

6   indulge me, we can continue to go on.  But as soon as my --

7   my client responds, I'll be right there with you and I'll

8   interrupt and let you know.

9              THE COURT:  All right.  Thank you.

10       So I'll defer ruling on the admission of Exhibit 2

11  until Alleon has sufficient time to verify the numbers for

12  themselves.

13             MR. BUTLER:  Thank you, Your Honor.

14             THE COURT:  Thank you.

15       Q.   Mr. McPike, can you pull up Exhibit Number 11?

16       A.   Yes, ma'am.

17       Q.   What is Exhibit Number 11?

18       A.   This is the payroll register for today's payroll.

19       Q.   Can you please inform the Court who created this

20  document?

21       A.   It was created by our financial team and payroll

22  staff.

23       Q.   And what -- why are there only 385 employees listed

24  on this -- 384?

25       A.   Yeah.  There are more than 384 employees receiving


                CINDY SUMNER, CSR (214) 802-7196

1   paychecks this pay period.

2        Q.    What is -- can you please open Exhibit Number 12?

3        A.    Yes.

4         Yes, ma'am.

5        Q.    Never mind.  Never mind about Exhibit Number 12.

6   (Indecipherable statement).  Go back to Exhibit Number 11.

7        A.    Okay.

8        Q.    The number on the bottom, the third column is

9   582,000.  Where is -- what makes up the other portion of the

10  600,000 that you need from the Court today?

11       A.    Certainly.  So to get the total payroll amount,

12  including payroll taxes, you have to add the second, third,

13  fourth, and fifth columns.  The 582,000, that's the actual

14  gross pay of the actual paycheck.  And then you have to add

15  in the taxes and that's where you get the total number.  So

16  you have to add the four columns to the right of the $582,000

17  to get the total payroll including taxes and the amount

18  that's withheld for benefits.

19       Q.    And can you remind the Court what that number is

20  again?

21       A.    Yes, I can.  It is $635,679.28.

22             MS. BOYDSTON:  The debtors would like to offer

23  Exhibit 11 for the wage motion.

24             THE COURT:  Any objections?

25             MR. BUTLER:  Say it one more time, Your Honor.


                    CINDY SUMNER, CSR (214) 802-7196

1  I'm sorry.

2        No, we don't.

3        Your Honor, we -- I do have that financial information,

4  if you want me to provide it to you.

5              THE COURT:  Okay.

6              MR. BUTLER:  From March 1st -- from March 1st

7  Alleon has received a gross amount from all pre-petition

8  account receivables of $1,072,045.91.  But of that amount,

9  $120,185.41 was returned yesterday through our communications

10  with Regions.

11             THE COURT:  All right.  So Exhibit 21 -- I'm

12  sorry.  Exhibit 2 is admitted, because that's consistent with

13  your numbers.

14        Thank you.

15             MR. BUTLER:  Okay.  Thank you, Your Honor.

16  Sorry.  I just hadn't had time to get that.

17             THE COURT:  Thank you.

18        And then Exhibit 7, that is being offered?  I'm sorry,

19  Exhibit -- what number is the exhibit that's being offered?

20             MS. BOYDSTON:  Exhibit 11, 11 is --

21             THE COURT:  11, okay, hold on.

22        Exhibit 11, the payroll register.  Any objections to

23  that?

24             MR. BUTLER:  No, sir -- no, ma'am, Your Honor.

25  I think that's probably relevant to the wage motion.


                 CINDY SUMNER, CSR (214) 802-7196

1              THE COURT:  Exhibit 11 is admitted.

2              MS. BOYDSTON:  Thank you, Your Honor.

3         Q.   Mr. McPike, what -- what happens today -- or excuse

4    me.

5         Mr. McPike, how did you learn that -- that the State of

6    Texas representatives were coming out to the State today --

7    coming out to the facilities today?

8         A.   We had a surveyor in one of our facilities earlier

9    this week who said she would be back on Friday to make sure

10   that paychecks were handed out because there was a concern at

11   all four locations.

12        Q.   And when did you receive that notice?

13        A.   I believe that was yesterday.

14        Q.   Each time that Alleon has swept these funds, have

15   you been given any notice that they were sweeping these

16   funds?

17        Let me rephrase that.  Let me rephrase that.

18        Earlier you stated that Alleon sweeps every day and

19   then usually they give the money back to you; is that -- is

20   that a correct understanding of what you -- you testified to?

21        A.   Yes.  So typically they -- the funds are swept

22   automatically from Regions to Alleon every day.  And then we

23   would make a request for return of cash and they pay

24   themselves according to the agreement between Alleon and

25   Remarkable Healthcare.  And then they return, typically,


                    CINDY SUMNER, CSR (214) 802-7196

1    prior to March 1st return cash for use and operation.

2        Q.    What -- starting on March 1st, did you start

3    requesting return of funds every day like normal?

4        A.    Yes.

5        Q.    And did Alleon return any of the funds upon your

6    request?

7        A.    No.

8        Q.    Did they provide any documentation or reason why?

9        A.    They -- the only -- the only notice we received was

10   an email from their counsel stating they would no longer be

11   returning any cash collections to Remarkable.

12       Q.    Did they say why?

13       A.    Because they believe that their cash collateral has

14   been given to Wes Wharton, which is incorrect.  So they have

15   violated our agreement with them because they don't

16   understand the agreement with Wes Wharton.

17             MR. BUTLER:  Your Honor, objection; calls for

18   a legal conclusion.

19             THE COURT:  Sustained.

20       Q.    If -- if Alleon had not been sweeping and keeping

21   each of the -- each of the -- the cash collections since

22   March 1st, would the debtors be able to pay their payroll?

23       A.    Absolutely.  The companies have seen an increase in

24   our collections in January, February, and so far in March

25   that they're holding.  And the company's very financial


                    CINDY SUMNER, CSR (214) 802-7196

1   viable right now.  The only thing that's causing us to

2   struggle is this issue with not giving our cash collections

3   back.

4       Q.   Okay.  Thank you.  Thank you, Mr. McPike.

5          MS. BOYDSTON:  Pass the witness.

6          THE COURT:  Okay.  Cross?

7          MR. BUTLER:  Your Honor, if we're -- if we're

8   on the wage motion, we have no objection to it.  I mean, and

9   if we're on joint administration, we have no objection.  If

10   we're on the sanctions, the -- I don't know if I even have a

11   question for him, Your Honor.  I already -- if the Court will

12   take judicial notice of the testimony that was given last

13   Tuesday, I don't think I have any questions for him.

14          THE COURT:  Any objection to the Court taking

15   judicial notice of the -- I guess it's not judicial notice.

16   You're asking the Court to apply the evidence presented at

17   the prior hearing in the prior case to also apply here?

18          MR. BUTLER:  You're -- you're correct, Your

19   Honor.  I'm sorry.  No, you stated it correctly.

20          MS. BOYDSTON:  No objection.

21          THE COURT:  Okay.  So -- all right.  So

22   ordered.

23     So you have no cross for this witness?

24          MR. BUTLER:  No, not at all, Your Honor.

25          THE COURT:  Okay.  Okay.  Does anyone else

1   have cross for this witness?

2              MR. CARRUTH:  Yes, Your Honor, just briefly.

3   Jeff Carruth for the landlords.

4              THE COURT:  Yes.

5              MR. CARRUTH:  Thank you.

6              CROSS-EXAMINATION

7   BY MR. CARRUTH:

8        Q.   Mr. McPike, of the 635,679 to be paid out in the

9   first payroll, how much of that is going to go to yourself

10  and other family members?

11       A.   I don't have that number.  But my -- an estimate of

12  Laurie Beth's salary, I believe is around $8,000 off the top

13  of my head and mine is typically somewhere around 5 or 6,000

14  a paycheck.

15       Q.   Okay.  Do you have any issue with for this interim

16  payroll foregoing any of the salary so that the employees

17  will get paid before yourselves?

18       A.   We always hold our pay until all of our employees

19  are paid.

20       Q.   I understand.  But on this particular payroll, are

21  you going to segregate or put your salary behind all of the

22  other employees?

23       A.   Yes, that's correct.  Just like we do every pay

24  period.

25       Q.   And that would go for you, yourself, and any other


                CINDY SUMNER, CSR (214) 802-7196

1  family member?

2      A.    That would go for Laurie Beth and I specifically.

3                  MR. CARRUTH:  Pass the witness.  Thank you.

4                  THE COURT:  Any other cross of this witness?

5      All right.  The witness is excused.  Any other evidence

6  you wish to present, Ms. Boydston?

7                  MS. BOYDSTON:  No, Your Honor.

8                  THE COURT:  Okay.  Any evidence any other

9  party wishes to present?

10                 MR. BUTLER:  Your Honor, Lynn Butler.

11     Could I very quickly and succinctly put on Leon

12 Chernyavsky of Alleon Capital?

13                 THE COURT:  All right.  Let's swear the

14 witness in.

15                 (The witness was sworn by the courtroom deputy.)

16                 LEON CHERNYAVSKY

17  The witness, having been duly sworn to tell the truth,

18 testified on his oath as follows:

19                 DIRECT EXAMINATION

20 BY MR. BUTLER:

21     Q.    Mr. Chernyavsky, when did Remarkable -- the

22 Remarkable entities become in default of their agreement with

23 Alleon Capital?

24     A.    In May 2023.

25     Q.    And that was before the first bank -- the second


                    CINDY SUMNER, CSR (214) 802-7196

1  bankruptcy?

2       A.   That was before the second bankruptcy.

3       Q.   Okay.  And were they still in default upon the

4  dismissal of the bankruptcy?

5       A.   Yes, they were.

6       Q.   Okay.  And did you continue to fund the debtor up

7  to February 29th?

8       A.   Yes, we did.

9       Q.   Okay.  And the money that you have collected since

10 March 1st, does that money represent all -- only pre-petition

11 receivables?

12      A.   That is correct.

13      Q.   Okay.  When were you notified that there was a

14 sweep on the Regions account yesterday?

15      A.   Yesterday when -- some time midday.

16      Q.   Okay.  And what did you do upon learning of that?

17      A.   I called my counsel immediately and returned the

18 money back.

19      Q.   Okay.  So your testimony is that Alleon Capital has

20 reversed or re-wired that money back in the debtor accounts?

21      A.   That's correct.  We have confirmation numbers to

22 prove it.

23      Q.   Okay.  Thank you.

24       And -- and the -- has there been any offer made to

25 Alleon Capital for adequate protection for new financing


CINDY SUMNER, CSR (214) 802-7196

1    going forward in this new case, the third case?

2        A.    No, none.

3                    MR. BUTLER:  Pass the -- pass the witness,

4    Your Honor.

5                    THE COURT:  Okay.

6        Cross?

7                    MS. BOYDSTON:  This is Liz Boydston for the

8    debtors.

9                    <u>CROSS-EXAMINATION</u>

10   BY MS. BOYDSTON:

11       Q.    Mr. Chernyavsky, are you -- did you just testify

12   that your -- your counsel did not give you either of the

13   offers that the debtors made to you?

14       A.    We did not receive any offers.

15       Q.    So your testimony right now is that Ms. Klein did

16   not tell you about my offer immediately after the March 19th

17   hearing on cash collateral?

18                    MR. BUTLER:  Your Honor, objection.  Other

19   than the attorney/client privilege issue that's (inaudible

20   few words due to audio cutting out).

21                    MS. BOYDSTON:  I missed -- I missed --

22                    THE COURT:  I'm sorry --

23                    MS. BOYDSTON:  I didn't hear what your

24   objection is.

25                    MR. BUTLER:  Invading the attorney/client

CINDY SUMNER, CSR (214) 802-7196

1  privilege, asked and answered.

2                THE COURT:  Objection sustained.

3       Q.   Are you aware, Mr. Chernyavsky, that the debtors

4  have made a written offer and an oral offer to your counsel

5  regarding cash collateral?

6       A.   No.

7                MS. BOYDSTON:  Your Honor, I would like to --

8  I guess I have to put in impeachment evidence, but I don't

9  have a virtual screen to do that.

10               THE COURT:  Okay.  The fact that you offered

11 pre-petition -- what's -- okay.  What's the relevance that

12 you -- you want to put in evidence that you made an offer of

13 adequate protection prior to the case being filed?

14               MS. BOYDSTON:  No.

15               THE COURT:  Is that what I'm assuming?

16               MS. BOYDSTON:  No.  If I may -- no, Your

17 Honor.

18               THE COURT:  Okay.  Hold on.

19          And the relevance of that --

20               MS. BOYDSTON:  Mr. Butler just --

21               THE COURT:  No.  That's not what --

22               MS. BOYDSTON:  What?

23               THE COURT:  Well, I --

24               MS. BOYDSTON:  I apologize, Your Honor.

25               THE COURT:  -- understand he asked

1  Mr. Chernyavsky if an offer of adequate protection has been

2  made and I understand he said, no.  But, again, I'm not sure

3  what's the relevance of that.

4            MS. BOYDSTON:  Your Honor, it goes to

5  impeachment.  It goes to just everything about what Alleon is

6  doing is based on either mistakes, misrepresentation, or just

7  not having the information.  How is it that we're standing

8  here today with being told, yes, we can -- yes, we can pay

9  our employees, but go find the cash when we have asked for

10 it.  We have made offers for adequate protection.  And we're

11 being -- and you are being told, no, we haven't.  And we

12 have -- I've done it in writing.  I've done it orally.  I've

13 put it in my motion.  I put it -- we put it in our

14 declaration.  We cannot understand what Alleon is doing here.

15 And this is the reasons why we're asking them to be

16 sanctioned.  They are not acting appropriately here.  They

17 simply just do not care about the patients' safety.  They

18 just want to crush this debtor.  That is what they want to

19 do.  And they should be sanctioned for their actions.

20    How is it appropriate that I've given two different

21 attorneys two different offers and neither offer was shared

22 with their client?  Their client who's holding more than a

23 million dollars of the debtors' cash.

24            THE COURT:  Well, is -- are they holding more

25 than a million dollars, or did they sweep more than a million


CINDY SUMNER, CSR (214) 802-7196

1    dollars?

2               MS. BOYDSTON:  They swept and are holding more

3    than a million dollars.

4               THE WITNESS:  No, we're not.

5               MR. BUTLER:  Leon, don't -- I mean,

6    Mr. Chernyavsky, don't -- don't say anything unless asked a

7    question.  I'm sorry --

8               THE COURT:  Okay.  All right.  I understand

9    your position.  But I don't think I -- I don't think I need

10   any evidence at this point about whether an offer of adequate

11   protection was made or not.  When we get to the adequate

12   protection issue, we'll take that up.  But I understand your

13   position.  Okay.

14        Now, anything further for this witness?

15              MS. BOYDSTON:  Yes.

16        Q.   Mr. Chernyavsky, isn't it true that the only reason

17   that the debtors got put in default was because Alleon

18   changed the borrowing base calculation?

19        A.   There was an amendment that was made in, I

20   believe -- I don't recall, but early on in our relationship

21   where we changed the borrowing base calculations and

22   Remarkable agreed to it.  And the borrowers were in formula

23   until May of 2023.

24        Q.   Isn't it true that when you say the borrower signed

25   it, or they agreed to it, it's because Alleon refused to give

CINDY SUMNER, CSR (214) 802-7196

1  payroll unless the debtors signed that borrowing base

2  amendment?

3      A.   No, that amendment was done --

4          MR. BUTLER:  Hold on.  What time period are we

5  talking about?

6          MS. BOYDSTON:  We're talking about March of

7  2023.

8      A.   Can you repeat your question, please?

9      Q.   Isn't it true that in March of 2023 when Alleon

10  changed the borrowing base calculation, Alleon forced the

11  debtors to sign the agreement to change the borrowing base by

12  withholding payroll?

13          MR. BUTLER:  Your Honor, objection.  This is

14  outside the direct testimony.  And the relevance I'm not sure

15  either.

16          THE COURT:  Objection sustained.

17          MS. BOYDSTON:  I'm -- I would like to respond

18  to that.  That is not -- that is not outside of it.  He

19  literally just said that there was a borrowing base change

20  and that it was agreed to.  And my question goes exactly to

21  why it was, quote/unquote, agreed to.

22          THE COURT:  Again, how does a borrowing base

23  changing have to do with anything before the Court today?

24          MS. BOYDSTON:  Because but for that forced

25  borrowing base changing, the debtor would not have been in


                    CINDY SUMNER, CSR (214) 802-7196

1  default.  All of this goes forward from what Alleon continues

2  to do to the debtors, to force the debtors into a (inaudible

3  word).  Every --

4              THE COURT:  So you're disputing whether you --

5  okay, hold on.  So you're disputing whether you were ever in

6  default and that Alleon was somehow in violation of your

7  agreements and -- because there was no default and,

8  therefore, they had an obligation to fund and they have not

9  funded; is that correct?

10             MS. BOYDSTON:  I -- sort of, yes.  Yes.  They

11  have an obligation to fund.  Yes, Your Honor.  But, yes.

12  They had the obligation to fund.  And the March 1st --

13             THE COURT:  Okay.  And from --

14             MS. BOYDSTON:  20 --

15             THE COURT:  -- what evidence do I have to

16  conclude that they had an obligation to fund?

17             MS. BOYDSTON:  So in the Exhibit Number 1 --

18             THE COURT:  Okay.

19             MS. BOYDSTON:  -- which is the declaration

20  which was filed on the docket at docket number 4.

21             THE COURT:  Okay.  I don't -- was it

22  somehow -- what is the exhibit number?  It wasn't in your

23  email, right, that you -- where you emailed all of the

24  exhibits to?

25             MS. BOYDSTON:  It was.


                 CINDY SUMNER, CSR (214) 802-7196

1                    THE COURT:  It was?

2                    MS. BOYDSTON:  Yeah, it was in the zip folder

3    because the exhibits are very large.  It's got the security

4    agreement, the loan agreement.  It's got every single thing

5    in it.

6                    THE COURT:  Okay.  Okay, I see.  All right.

7    So in the declaration --

8                    MS. BOYDSTON:  The declaration --

9                    THE COURT:  -- there's something about it

10   there?  Okay.

11                   MS. BOYDSTON:  Yes.

12                   THE COURT:  So what are you relying on

13   exactly?

14                   MS. BOYDSTON:  I'm relying on the borrowing

15   base --

16                   THE COURT:  Which exhibit?  Which exhibit?

17   Which page?  Which number?

18                   MS. BOYDSTON:  So page -- on the -- on the

19   declaration itself, which is the same declaration that was

20   admitted on March 19th, which was admitted by the Court and

21   which this Court has just applied to here, to this case, and

22   then filed again with a new title.  It's paragraph --

23                   MR. BUTLER:  Actually, Your Honor, I think

24   you -- I think you reserved your ruling on evidence to give

25   us time to look at the emails.  Since the case was dismissed,


                    CINDY SUMNER, CSR (214) 802-7196

1  I will admit --

2            THE COURT:  And you haven't looked at it yet;

3  is that right?

4            MR. BUTLER:  I --

5            THE COURT:  Okay.  Well --

6            MR. BUTLER:  Yes, ma'am.

7            THE COURT:  -- here's what we're going -- hold

8  on.  Here's what we're going to do.  We're going to take a

9  recess.  As you all know, I am traveling and I don't have

10  that much time before I need to get on a flight in a few

11  hours.  And so I'm going to give you all time to visit, to

12  look at the exhibits, and to visit.  It seems to me I don't

13  know whether you all have a misunderstanding or not.  I don't

14  know.  But what I do know is now that it's here in front of

15  me, we can certainly provide protective orders and otherwise

16  between the parties.  And what I want to understand is for

17  purposes of today and what needs to be done today for the

18  care of the patients, okay, what has to be done today and can

19  you all agree to an agreement?  And that may involve, among

20  other things, getting Wes Wharton in the discussion.

21       It seems to me whenever there's an issue of potential

22  priming of liens or otherwise somehow adversely affecting the

23  rights of an existing creditor you usually wind up having

24  some kind of three-way or two-way agreements between the

25  potential parties.  I don't see anything right here.  It just


                CINDY SUMNER, CSR (214) 802-7196

1    seems like you all are talking at each other as opposed to

2    with each other.  But I want you all to actually visit about

3    what you're going to do today to avoid harm to the credit --

4    to the parties who are not before the Court today, the ones

5    who are the most vulnerable and who may be affected, which

6    are the patients.  Okay.

7         After we get past today, we will have a more fulsome

8    hearing in the very near future.  But I need -- I need you

9    all to discuss that and I need you to limit the issues for

10   today about that issue.  Okay.  Because that's the only

11   emergency that justifies a swift ruling from the Court.

12              MR. BUTLER:  Your Honor, Alleon completely

13   understands.  But we are going to need Wes Wharton.

14              THE COURT:  I understand.

15         I'm going to give you -- I'm going to continue this for

16   today until 1:30, okay.

17              MS. BOYDSTON:  Your Honor, this is --

18              THE COURT:  At which time we will have --

19              MS. BOYDSTON:  I'm sorry.  Go ahead.

20              THE COURT:  At which time we will have a brief

21   hearing and then we may have to continue it until tonight.

22   But we're going to get it done today, at least the temporary

23   issues that need to be decided.  Okay.  But you all need to

24   have a visit.

25              MS. BOYDSTON:  Your Honor, can I please

CINDY SUMNER, CSR (214) 802-7196

1  request that you ask for -- or instruct Ms. Milligan, or

2  something, to make sure that the facilities aren't taken when

3  paychecks aren't delivered at noon.

4         MS. MILLIGAN:  Your Honor, this is Layla

5  Milligan on behalf of the Health & Human Services Commission.

6     I have not -- I have -- I was concerned with the

7  comment by Ms. Boydston this morning that the State is taking

8  over these facilities.  That is not accurate.  Health & Human

9  Services, the Texas Health & Human Services, at least I can

10  speak on their behalf, does not take over facilities in this

11  manner.  They don't -- are not -- will not be taking over the

12  facilities.  I don't know where that information came from.

13  But I -- and there may be inspectors onsite for different

14  reasons.  But I've been assured, at least from two different

15  entities and my representative at HHSC that that's just not

16  something that happens and it isn't happening with these

17  facilities today.  So I don't think that is something that

18  the Court needs to be concerned with.  The operators are

19  clearly responsible for making sure patient care is

20  continued.  But the State is not taking over any of these

21  facilities and that's just not something that happens.  So I

22  just wanted to assure the Court and the parties of that.

23         THE COURT:  Okay.

24         MS. MILLIGAN:  Thank you so much.

25         THE COURT:  Thank you.


          CINDY SUMNER, CSR (214) 802-7196

1      Okay.  All right.  Anything else before we recess?

2            MR. BUTLER:  No, Your Honor, not from Alleon

3  Capital.

4            THE COURT:  All right.  We stand in recess

5  until 1:30.  Thank you.

6                  (Brief recess ensued.)

7            COURTROOM DEPUTY:  Number 1, Remarkable

8  Healthcare of Carrollton, 24-40605; motion for joint

9  administration, motion for sanctions, and motion to pay

10 pre-petition salaries and wages.  And, number two, Remarkable

11 Healthcare of Dallas, 24-40608; amended motion for joint

12 administration.  Number three, Remarkable Healthcare of Fort

13 Worth, LP, 24-40610; amended motion for joint administration.

14 Number four, Remarkable Healthcare, LLC, 24-40611; amended

15 motion for joint administration.  Number five, Remarkable

16 Healthcare of Seguin, 24-40612; amended motion for joint

17 administration.

18           THE COURT:  All right.  Appearances.

19           MS. BOYDSTON:  Good afternoon, Your Honor.

20 Liz Boydston of Gutnicki on behalf of the debtors.  I also

21 have Alexandria Rahn with me.

22           MS. KLEIN:  Good afternoon, Your Honor.  This

23 is Buffey Klein with Husch Blackwell on behalf of Alleon

24 Capital Partners.

25           MR. BUTLER:  And, Your Honor, I apologize.


                 CINDY SUMNER, CSR (214) 802-7196

1  This is Lynn Butler on behalf of Alleon Capital.  I was on

2  mute.

3            MR. SALITORE:  Your Honor, Marc Salitore for

4  the U.S. Trustee.

5            MS. THARPE:  Your Honor, Whitney Tharpe --

6            MR. CARRUTH:  Your Honor, Jeff Carruth -- go

7  ahead, Whitney.

8            MS. THARPE:  Whitney Tharpe on behalf of

9  Health & Human Services.  Ashley Benton is also here on

10  behalf of Health & Human Services.

11            MR. CARRUTH:  Jeff Carruth on behalf of the

12  landlords.  Also on the line is Randy Glen, also on behalf of

13  the landlords.  Josh Kilgore will be joining us, also.

14            MS. MILLIGAN:  Layla Milligan for the Texas

15  Health & Human Services Commission.

16            MR. KRIENKE:  Trent Krienke for Wes Wharton

17  County Hospital District.  Also on the line is David Mack,

18  CFO with n County Hospital District.

19            MR. KIN:  Richard Kin --

20            THE COURT:  All right.  Where are we?  All

21  right.  Where are we now?

22            MS. BOYDSTON:  Your Honor, this is Liz

23  Boydston for the debtors.

24       Unfortunately there is no agreement.  Mr. Krienke, who

25  is on the line, counsel to Wes Wharton, he met with the

                CINDY SUMNER, CSR (214) 802-7196

1  parties and spent a good half hour trying to get Alleon

2  comfortable.  Alleon's counsel says that they are not willing

3  to fund if the McPike's stay involved.  That is their

4  position.

5          MS. KLEIN:  Your Honor, this is Buffey Klein.

6  Just to intersect.

7      We did have an opportunity to meet with Mr. Krienke.

8  We had a very fruitful discussion.  He has proposed a

9  structure that -- that I think my client is very interested

10  in pursuing.  But as I explained to Ms. Boydston, the

11  timing -- the timing makes it difficult for us to get this

12  done today and to get the approval to make any advances

13  today.  I think that's really the crux of it.

14      Obviously, you know, my client is very concerned with

15  going forward with the current management, as has been made

16  clear throughout the last few hearings before the Court.  But

17  we're in a position where I think, Judge, there is -- there

18  is a (inaudible word), but it's a timing -- the timing is

19  not -- you know, we're not able to get it done today, I think

20  is the point of it.

21          MS. BOYDSTON:  Your Honor, this is -- this is

22  Liz Boydston.

23      Alleon really can't claim surprise.  The debtors

24  have -- the debtors have begged them daily since March 1st

25  and repeatedly told them this is going to happen.  You heard

CINDY SUMNER, CSR (214) 802-7196

1   testimony from Mr. McPike on the 19th -- the hearing on the

2   19th that he tried hard to get Alleon and its counsel to meet

3   with Trent Krienke and they refused.  I filed this original

4   motion for sanctions on March 14th, eight days ago when the

5   total amount swept by the -- Alleon was only $462,000.  That

6   put Alleon on notice that the debtors were requesting

7   disgorgement.  And that disgorgement was going to be

8   necessary to pay today's payroll.

9        Alleon made the decision to continue sweeping daily and

10  daily and daily even after the March 19th hearing when

11  testimony was clear and has been admitted in this matter that

12  payroll had to be funded today.  They cannot claim surprise.

13  We believe that keeping the business open as a going concern

14  is adequate protection for Alleon.

15       We did file the cash collateral motion over the break.

16  And we do make an oral request for use of cash collateral

17  over objection, because the (indecipherable two words)

18  testimony that's the best way to prevent diminution of value

19  to the lender is to keep the doors open, to maintain value in

20  a going concern.  That's the best way that this lender can be

21  adequately protected.  The lender has admitted in the prior

22  case that they are oversecured.  Public policy, patient

23  safety, all of this goes in favor of forcing Alleon to

24  disgorge the payroll amount so the debtors can make payroll

25  today.


CINDY SUMNER, CSR (214) 802-7196

1        I can put Mr. McPike back on the stand and talk about

2   the diminu -- what will happen if they cannot make payroll

3   today and what has happened in the last two hours since we

4   got off the hearing and everything that's happened since then

5   with their employees who were listening on this hearing.

6              MR. BUTLER:  Your Honor, this is Lynn Butler.

7        They -- the -- our offer was in an immediate revocation

8   of Sub V and put in a Chapter 11 Trustee.  We have no faith

9   in the McPike's.  And then the receipt that they received

10  from yesterday, the 120, whatever they got today should

11  cover.  It will give Alleon time to go to its lender and get

12  permission to over extend again.  But it just -- that's the

13  best we can do.  We're making the offer, it just cannot

14  involve the McPike's in any way, shape, or form.

15             MS. BOYDSTON:  And, Your Honor, there's no way

16  $120,000 -- which, by the way, we did reach out to Regions.

17  They did -- Alleon did refund it, but they didn't refund it

18  into an account that is accessible by the debtors.  And so

19  Regions is trying to remedy that.  And so even if we could

20  access it and this Court granted us the ability to use it,

21  $120,000 will not keep our -- our employees.  And we -- I've

22  already explained it to Mr. Butler that if they think that

23  this case can't even afford a Subchapter V, how the heck is

24  it going to afford a Chapter 11 with a Committee and with

25  monthly operating -- I mean quarterly operating fees and


                  CINDY SUMNER, CSR (214) 802-7196

1   everything else that comes in with it?  And Harney Partners

2   is a Chapter 11 Trustee is going to be exorbitantly

3   expensive.  And they required Compass to come in.  And we've

4   already heard testimony that Compass is extraordinarily

5   expensive to collect on.  That is -- all that's going to do

6   is immediately turn this into a liquidation.  That's all that

7   will do.

8               MR. BUTLER:  Your Honor, it's already a

9   liquidation.  Current management doesn't realize it.  This is

10  a path forward to get a new operating company in there that

11  leaves Remarkable as a shell company with AR to collect.  The

12  case is effectively over as an operating entity.

13              THE COURT:  All right.  Does anyone else wish

14  to be heard?

15              MR. SALITORE:  Marc Salitore for the U.S.

16  Trustee, Your Honor.

17              THE COURT:  You may proceed.

18              MR. SALITORE:  Thank you.  Just briefly.

19       At least the U.S. Trustee, what we understood

20  Mr. Butler to refer to with respect to the posture of the

21  case is currently in Subchapter V was noting the

22  differentiation between the removal of the

23  debtor-in-possession under 1185 as opposed to the appointment

24  of a Chapter 11 Trustee more conventionally seen under

25  Section 1104.  At least that was how we interpreted it.  And


CINDY SUMNER, CSR (214) 802-7196

 1  we'd just remind the Court of that distinction.

 2       Thank you.

 3              THE COURT:  Thank you.

 4              MR. CARRUTH:  Your Honor, Jeff Carruth on

 5  behalf of the landlords.

 6       We would be comfortable with a Trustee operating the

 7  debtor.

 8       Thank you.

 9              THE COURT:  All right.  So nothing has changed

10  on the procedural posture.  You're asking the Court to

11  require disgorgement as part of a sanctions order sanctioning

12  the creditor because the creditor allegedly is in breach of

13  your contract.  Is that -- is that kind of where we are?

14              MS. BOYDSTON:  No, Your Honor.  We are not

15  saying that they're in breach of a contract.  We're saying

16  that they are acting in bad faith and that they are

17  retaliating against Mr. McPike and Mrs. McPike because of the

18  fact that they entered the QIPP Program against the lender's,

19  I don't want to say order, they said, no.  They refused to do

20  that.

21       This motion for sanctions is not based on any Rule 11.

22  We heard you loud and clear that you expected a Rule -- that

23  we couldn't bring up the agreement because of the fact that

24  there was no Rule 11 that was put down into -- into contract.

25  This is based on the bad faith of the lender, the statements

                    CINDY SUMNER, CSR (214) 802-7196

1    that the lender made to you in January saying that they would

2    put patient safety first, and here they are not putting

3    patient safety first.  They misled this Court into believing

4    that they would do that.  They have continued to mislead this

5    Court into believing they would do that.  And today we're

6    being told they -- they're willing to work -- they're willing

7    to help if the McPike's are out.  But they can't fund.  So

8    they only have $120,000 they're willing to allow the debtors

9    to use and only if the McPike's are not in.  That is not

10   negotiating in good faith.  None of that -- nothing that

11   they're doing is in good faith.  It is all retaliatory

12   because Mr. Chernyavsky got very mad at Mr. McPike.  It is

13   bad faith.  It's bad acts.  It shouldn't be allowed.  It's

14   not based on breach of a contract.

15            THE COURT:  All right.  Well, whether you're

16   calling it bad faith or not, at the end of the day the

17   procedural posture is incorrect.

18            Given the posture of this case and the motions that

19   were filed and the notices that were sent out on this motion,

20   where the Court has the (inaudible word) of the motion to

21   authorize payment of pre-petition wages, from what I

22   understand, none of the parties object other than to payments

23   to insiders, those being the McPike's and particularly any

24   family members.

25            So did I incorrectly state the position of the parties

CINDY SUMNER, CSR (214) 802-7196

1   with respect to the motion to pay post-petition wages?

2            MS. BOYDSTON:  No, Your Honor.

3            THE COURT:  All right.  Under those

4   circumstances, the Court will grant the motion to pay

5   pre-petition wages, other than payment to any insiders,

6   specifically the McPike's or any family members.  I'll set a

7   final hearing on this matter on April 2 at 1:30 p.m. to take

8   up final authorization to pay pre-petition wages,

9   specifically with respect to insiders.  I'm just not prepared

10  to do that on this shortened notice at this point in time.

11           MS. BOYDSTON:  Your Honor, can we get the

12  joint admin motion?  All parties said that they would -- that

13  they did not object to that too?

14           THE COURT:  I'm sorry, the joint what motion?

15           MS. BOYDSTON:  The joint administration

16  motion.

17           THE COURT:  Oh, yes.  That's -- I was going to

18  go there next.

19       With respect to the joint administration motion, I

20  didn't see -- hear any objections to the joint

21  administration.

22       Does anybody disagree?

23       All right.  So then the motion for joint administration

24  is granted.

25           MS. BOYDSTON:  So, Your Honor, there's no


                    CINDY SUMNER, CSR (214) 802-7196

1  equitable relief what -- relief whatsoever --

2              THE COURT:  I don't think I have the

3  authority.

4              MS. BOYDSTON:  -- under 105?

5              THE COURT:  I haven't seen any -- no.  If

6  that's your only basis of sanctioning a creditor for,

7  quote/unquote, acting in bad faith pre-petition, I don't

8  believe I can grant that motion.  The motion is denied.

9       So that's where we are.  The parties can submit an

10  order consistent with that ruling.

11      Is there anything else we need to take up today?

12             MS. THARPE:  Your Honor, this is Whitney

13  Tharpe with the U.S. Attorney's Office on behalf of Health &

14  Human Services.

15      We would just request -- we would just request that any

16  order includes the standard language protecting Health &

17  Human Services right to -- nothing can impair their

18  regulatory powers.  And I don't -- I'm not sure if that will

19  be implicated in the order to pay pre-petition wages, or

20  post-petition wages.  But we just wanted to make them aware

21  of that.

22             THE COURT:  Well, if you want that, you file a

23  motion.  I don't see that -- if you think 353 or 352 already

24  protects you, it protects you.  If it doesn't, it doesn't.

25  But I'm not going to -- I don't have any issues with respect

CINDY SUMNER, CSR (214) 802-7196

1   to regulatory powers before the Court today.

2                   MS. THARPE:  Okay.  Thank you, Your Honor.

3                   THE COURT:  Okay.  Anything further?

4        All right.  Thank you.  Parties are excused and we're

5   adjourned.

6                   (End of Proceedings.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    CINDY SUMNER, CSR (214) 802-7196

1                      C E R T I F I C A T E

2          I, CINDY SUMNER, do hereby certify that the

3    foregoing constitutes a full, true, and complete

4    transcription of the proceedings as heretofore set forth in

5    the above-captioned and numbered cause in typewriting before

6    me.

7

8

9

10

11

12

13

14                      /s/Cindy Sumner

15          _____

16          CINDY SUMNER, CSR #5832
            Expires 10-31-2024
17          Cindy Sumner, CSR
            5001 Vineyard Lane
18          McKinney, Texas 75070
            214 802-7196
19

20

21

22

23

24

25


                CINDY SUMNER, CSR (214) 802-7196