```
1              IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE EASTERN DISTRICT OF TEXAS
2                       SHERMAN DIVISION

3

4    IN RE:              )   BK. NO:  24-40605-BTR

5                        )

6    REMARKABLE  HEALTHCARE )

7    OF CARROLLTON, LP       )

8        D E B T O R.       )

9

10

11            *   *   *   *   *   *   *   *   *   *

12               TRANSCRIPT OF PROCEEDINGS

13            *   *   *   *   *   *   *   *   *   *

14

15

16

17

18

19

20      BE IT REMEMBERED, that on the 2nd day of April, 2024,

21   before the HONORABLE BRENDA T. RHOADES, United States

22   Bankruptcy Judge at Plano, Texas, the above styled and

23   numbered cause came on for hearing, and the following

24   constitutes the transcript of such proceedings as hereinafter

25   set forth:
```

CINDY SUMNER, CSR (214) 802-7196

1                    I N D E X

2                                              PAGE

3    JON McPIKE

4        DIRECT EXAMINATION
             BY:  Ms. Rahn                     14
5        CROSS-EXAMINATION
             BY:  Mr. Carruth                  15
6            BY:  Ms. Klein                    24
         RECROSS-EXAMINATION
7            BY:  Mr. Carruth                  33

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

              CINDY SUMNER, CSR (214) 802-7196

1              P R O C E E D I N G S

2              COURTROOM DEPUTY:  Page 7, number 19,

3    Remarkable Healthcare of Carrollton, LP, 24-40605.  Final

4    hearing on motion to pay pre-petition salaries and wages.

5              THE COURT:  All right.  Appearances.

6              MS. RAHN:  Yes, Your Honor, this is Alexandria

7    Rahn on behalf of the debtors, Remarkable Healthcare.

8              MS. KLEIN:  Good afternoon, Your Honor.

9    Buffey Klein, Husch Blackwell, on behalf of Alleon Capital

10   Partners.

11             THE COURT:  Okay.

12             MR. WEISBART:  Mark Weisbart the Subchapter V

13   Trustee.

14             MR. CARRUTH:  Jeff Carruth on behalf of the

15   KRS landlord entities.  Also on the line with us is Randy

16   Glen, who is co-counsel on the healthcare issues and our

17   principal, Josh Kilgore also on the line today.

18             THE COURT:  Okay.

19        All right.  Where are we?

20             MS. RAHN:  Your Honor, we're here today to

21   talk about the final -- a final hearing for the pre-petition

22   wages and other benefits continuing forward.  And in the --

23   it's all laid out in the motion at docket number 5.  And

24   reflected therein the upcoming payroll that's due this Friday

25   covers the stub period of March 18th through 19th, which


                CINDY SUMNER, CSR (214) 802-7196

1 accrued approximately $105,000 in pre-petition wage

2 obligations plus the amounts that are post-petition, which

3 will be approximately $550,000.  We do not have that exact

4 figure yet, because they will not be available until this

5 evening.

6            THE COURT:  Okay.  But the motion today is

7 just to pay the -- it's a final hearing on the pre-petition

8 wages motion, right?

9            MS. RAHN:  Correct, Your Honor.

10            THE COURT:  Okay.

11            MS. RAHN:  And we still have the objection by

12 the landlord here.  And we would -- we would like it if the

13 McPikes do receive their salaries going forward.  Because in

14 the interim motion they -- the McPikes and their family did

15 not receive any of their pre-petition benefits.

16            THE COURT:  Okay.  Again, today -- well, I

17 guess your pre-petition wage motions request some kind of

18 relief related to post-petition -- let's see.

19            MS. RAHN:  This pay period includes two days

20 of pre-petition wages.

21            THE COURT:  Okay.  So let me hear from

22 Mr. Carruth.  What's the objection?

23            MR. CARRUTH:  Well, Your Honor, I think as we

24 articulated last time, the objection is if cash is short and

25 we're raking and scraping to make one property payroll for


                    CINDY SUMNER, CSR (214) 802-7196

1    employee safety, health, and welfare, then the principals who

2    have control of the finances should not take another

3    paycheck.  Especially at the high salaries that they have

4    been enjoying throughout.  They've been paying themselves and

5    not paying the landlord, also.  There's $3 million in

6    arrearage to the landlord.

7           I think the additional concern today is -- and this

8    kind of goes back to not necessarily right in line with this

9    motion, most of which is -- was sort of decided or determined

10   last time.  But I think the issue is whether or not the

11   remaining -- whether the debtors have money and whether

12   Seguin has money, in particular for upcoming payroll.  And

13   that -- there's two or three drivers of that.  One is whether

14   there are additional funds available from West Wharton.  How

15   much are those funds?  What is the total payroll?  We're

16   unclear and uncertain as to the status of the funding from

17   West Wharton.  The debtor says they have it.  We're not sure

18   that that's exactly the case because we have not seen

19   documents, emails, or anything to confirm that.

20          And then the second issue is whether or not last time

21   when they -- it was explained that there was money for the

22   Seguin payroll, whether or not that money -- some of that

23   money actually came from other debtors and whether there was

24   commingling.  And so, you know, we --

25              THE COURT:  Commingling because these are


                    CINDY SUMNER, CSR (214) 802-7196

1   separate estates, you mean?

2           MR. CARRUTH:  Yes, Your Honor.

3           THE COURT:  Okay.

4           MR. CARRUTH:  So there was funds pulled from

5   the other three properties in order to get up to the 120 or

6   thereabouts for the funds that they used for the Seguin

7   payroll on the emergency roughly 10 days ago.

8       So, you know, this motion, what's left of this motion

9   may have fairly narrow relief.  But, you know, the global

10  issue is that they've kind of been driving this case along

11  the way it remain.  And so that's what our concern is today.

12          THE COURT:  Okay.  So you're saying they

13  shouldn't get paid because they're insiders, that's the first

14  part I heard.

15          MR. CARRUTH:  Yes, Your Honor.

16          THE COURT:  Is that accurate?

17          MR. CARRUTH:  Correct.

18          THE COURT:  And second, you're concerned about

19  the commingling of assets of the estate?

20          MR. CARRUTH:  Correct, Your Honor.

21          THE COURT:  Okay.  Is there anything else?

22          MR. CARRUTH:  We have been trying to get

23  PointClickCare access for all of the properties.  We've

24  received PointClickCare access for three of the properties

25  from the last 24 to 48 hours, but not the Seguin property.


CINDY SUMNER, CSR (214) 802-7196

1   That -- we're trying to get that access also in case there is

2   another emergency and we have to intervene or assist with

3   that property, as well.  That gives us the financial

4   information for receivables, expenses, things of that nature

5   in case we have to step in and prepare to take over the

6   property.  So -- it's also a patient care issue because we

7   have to have resources lined up to care for the patients in

8   case the Seguin property also faces difficulties.

9             THE COURT:  Okay.  Let's start with I think

10  all I reserved for the final hearing purposes on the

11  pre-petition wages motion was the payment of wages to the

12  insiders, right, the principals, because the payment to the

13  other employees were allowed at the interim hearing, right?

14  So I'd like to hear about who you're proposing to pay now on

15  a final basis, how much they are being paid, what services

16  are being performed, and how many hours they're working for

17  it, et cetera.

18            MS. RAHN:  Yes, Your Honor.

19       So the three individuals are Laurie Mc -- Laurie Beth

20  McPike, Jon McPike, and Chris McPike.  And each pay period

21  Laurie McBeth (sic) receives $6,534.80.  And her job

22  responsibilities include managing cash collections team and

23  doing a daily detailed review of the outstanding accounts

24  receivable.  She has oversight of the debtors' human

25  resources team, including daily analysis of labor costs,

CINDY SUMNER, CSR (214) 802-7196

1  personnel action process, employee management.  She has

2  oversight of the therapy teams.  She has oversight over all

3  financial compilations and analysis of the trending data for

4  all operations.  And she looks at that and then creates

5  improvement actions plans based on those results.  She also

6  reviews any documents in kind of a legal aspect and she has

7  oversight over all operations and the leaders of the company.

8  And since this bankruptcy has begun, she's continued to work.

9       We have been working with the landlords to transition

10  the management and operations of the three facilities that

11  are in the DFW area.  And we're still working on negotiating

12  the individual logistics of all of that.  But at this time

13  she's still working full time for the debtors to keep these

14  facilities running.

15       The next person on the list is Jon McPike, who he

16  receives each paycheck $4,717.37.

17            THE COURT:  Okay.  4,000 what?

18            MS. RAHN:  $717.37.

19            THE COURT:  Okay.

20       Q.  His job responsibilities include daily operations,

21  oversight of all four locations, regulatory management, daily

22  cash management, the regional team management.  He has daily

23  contact with the facilities' leadership and discusses any

24  operational issues and improvements.  He's in charge of

25  metric management, the quality assurance and performance

CINDY SUMNER, CSR (214) 802-7196

1    improvement oversight.  And he, once an action plan is

2    implemented -- or once an action plan has been decided on,

3    he's the person that implements those based on Laurie

4    Beth's -- the plan.

5         And then the last McPike is Chris McPike.  And he

6    receives $2,884.61.  He assists in the back office with all

7    of the IT needs, including computer setup and repair, phone

8    system management, new employee setup.  He also is kind of

9    the account manager in that he completes payroll and runs all

10   payroll checks and then delivers them to each of facilities.

11   Like all other employees, the McPikes also live paycheck to

12   paycheck and do not and have not taken anything above their

13   salaries from any of the Remarkable entities.  So it's really

14   imperative that they do continue to earn a paycheck while

15   this is continuing on.

16              THE COURT:  Okay.  How many pay periods a

17   year?

18              MS. RAHN:  It's a bimonthly, so it's two, so

19   24.

20              THE COURT:  Okay.  So every -- every 15 days?

21              MS. RAHN:  Correct, Your Honor.

22              THE COURT:  Okay.  So Laurie Beth is 13,069 a

23   month?  And Jon is 9,434 a month?  And Chris is 5,768 a

24   month?

25              MS. RAHN:  That sounds right.


                  CINDY SUMNER, CSR (214) 802-7196

1            THE COURT:  Okay.  So is this the work they've

2    done for all of the facilities, or just the Seguin facility?

3    Because all -- the other facilities are now being run by

4    others, right, by the landlord, or --

5            MS. RAHN:  Correct, Your Honor.  But this is

6    also for the work that was done from March 18th through 31st.

7    So the -- it was as of -- first of all, the new management

8    hasn't completely -- we haven't completely made the

9    transition, so the McPikes have been having to work the same

10   that they would have to facilitate this transition.  And they

11   are still doing work with the Seguin property.  So for the

12   amounts being asked for right now, it would be for the --

13   they were working full time and running these facilities

14   during this transition.

15           THE COURT:  Okay.  And what would -- what is

16   the market for a person doing the same work as Ms. Laurie

17   Beth McPike?  Do we have any information or evidence about

18   that?

19           MS. RAHN:  From what I have been told by the

20   debtor, which I can call Jon McPike to testify to this, if

21   you'd like.  Her salary is a fraction of what someone in her

22   capacity would normally earn, because she is doing so many --

23   she's wearing so many different hats when it comes to cash

24   collections and then prior -- during and prior, she's been

25   trying to find new financing for the debtors.  And it


                    CINDY SUMNER, CSR (214) 802-7196

1    normally would require multiple personnel, but she's working

2    seven days a week in order to be able to make these things

3    happen.

4         What Mr. McPike does is that he also is the -- in

5    charge of a bunch of different teams in the operations.  And

6    that anyone that would come in to manage this would have to

7    also work seven days a week and it will cost what he believes

8    would be double the current salary he takes.

9         And then Chris, he's in charge of all payroll services,

10   IT services.  He's plant operations assistant.  The

11   accounting clerk.

12             THE COURT:  All of those things that you're

13   talking about is for all the different debtors, right, not

14   just the Seguin property?

15             MS. RAHN:  Correct, Your Honor.

16             THE COURT:  So --

17             MS. RAHN:  So those may -- depending on how

18   the transition works, what the landlords -- how they'll stay

19   on in those positions, that could change moving forward.  But

20   right now for at least this -- at the time being, they are

21   currently still doing their full positions.

22             THE COURT:  Okay.  What is Laurie Beth

23   McPike's qualifications?

24             MS. RAHN:  Yes, Your Honor.  So Laurie Beth

25   has been in healthcare leadership for 30 years.  Most


CINDY SUMNER, CSR (214) 802-7196

1  recently she was the president of the Texas Region for the

2  Health South Corporation from 2004 to 2009.  She assumed the

3  operational responsibility and accountability for a $280

4  million business until employing over 3,100 employees.

5           THE COURT:  Okay.  And what was her salary at

6  that time?

7           MS. RAHN:  I do not have that information.

8           THE COURT:  Okay.

9           MS. RAHN:  I can put together a supplement, if

10  you'd like.

11           THE COURT:  I don't know that I will need it

12  yet, but, okay.

13           MS. RAHN:  Okay.  So she's -- she's worked in

14  the industry.  And before she was working in leadership in

15  the healthcare industry, she was a licensed physical

16  therapist.  And so -- she's used that distinct clinical

17  background in order to facilitate her leadership I the

18  healthcare arena.  And she originally came to Texas as a

19  program director for the brain injury and stroke programs of

20  a start-up rehabilitation hospital in Austin.  So she has

21  really extensive experience in the healthcare leadership

22  sector.

23           THE COURT:  Okay.  And Jon McPike?

24           MS. RAHN:  He also has 30 years experience.

25  He was the assistant director of -- or he was an assistant

CINDY SUMNER, CSR (214) 802-7196

1  director for the Dallas County Ombudsman Program for the

2  Texas Department of Aging.  He was also an activities

3  director at the beginning of his career.  He has his Texas

4  Nursing Home Administrator's License.  And has successfully

5  turned around several failing nursing facilities achieving

6  financial operational and clinical success.  He was -- an

7  area administrator, he led six (inaudible word) facilities

8  through the acquisition/transition process and successful

9  change of ownership surveys.  He was also the chief executive

10  officer of Health South Rehabilitation Hospital of Fort

11  Worth, most recently.

12              THE COURT:  Okay.

13              MS. RAHN:  And he holds several different

14  board member positions of key associations such as The

15  Alzheimer's Association and Arthritis Foundation.

16              THE COURT:  Okay.  And Chris?

17              MS. RAHN:  I do not have any -- much

18  background information on Chris.  But I can get that for you.

19  Or I can ask -- Mr. McPike could testify to it, if you would

20  like for me to call him.

21              THE COURT:  Your hearing.  Your evidence.

22              MS. RAHN:  Can I call Mr. Jon McPike --

23              THE COURT:  Certainly.

24              MS. RAHN:  -- to the stand?

25              (The witness was sworn by the courtroom deputy.)


                    CINDY SUMNER, CSR (214) 802-7196

1                    <u>JON McPIKE</u>

2    The witness, having been duly sworn to tell the truth,

3    testified on his oath as follows:

4                    <u>DIRECT EXAMINATION</u>

5    BY MS. RAHN:

6        Q.   Mr. McPike, could you tell me a little bit about

7    your relationship to Chris McPike?

8        A.   He's my son.

9        Q.   Great.  And could you tell me what his background

10   is?

11       A.   Yes.  He's actually done a variety of things.  He

12   managed a private baseball association in Keller where he

13   managed all of the operations; their back office payables,

14   their pot operations for field repair, and their payroll.

15       Q.   Is there anything that I didn't say about your

16   background that you would like to highlight for the Court?

17       A.   No.  I think you did a good job summarizing my

18   background.  It's closer to 37 years, almost 40 in

19   operations, including hospital leadership and multiple

20   facility management.  Laurie Beth has -- she ran all 14

21   free-standing hospitals for Health South in Texas.  And all

22   of their -- all of their satellite businesses, as well, like

23   hospice, home health surgical centers, outpatient centers for

24   the State of Texas for ten years.

25       Q.   Great.

```
 1                    MS. RAHN:  I do not have any other questions.

 2                    THE COURT:  Okay.  Did you have any cross?

 3  Did you wish to cross-examine the witness?

 4                    MR. CARRUTH:  Yes, Your Honor, if I may.

 5                    THE COURT:  You may.

 6                    CROSS-EXAMINATION

 7  BY MR. CARRUTH:

 8       Q.   Mr. McPike, the -- your responsibilities as to the

 9  Dallas, Carrollton, and Fort Worth properties at this point

10  are assisting in the transition?

11       A.   Not yet.

12       Q.   And why --

13       A.   We haven't begun the transition yet.

14       Q.   Okay.  But once the transition begins, that's going

15  to be your primary responsibility?

16       A.   Yes.

17       Q.   Okay.  And what is holding up the transition at

18  this point?

19       A.   I don't believe we've come to terms, counselor.  We

20  had one call for about an hour Friday and we haven't had

21  another since.

22       Q.   Okay.  And -- but that process requires your

23  involvement in a smooth hand off?

24       A.   That's correct, it does.

25       Q.   And with respect to all of the -- so right now
```

CINDY SUMNER, CSR (214) 802-7196

1    you're asking for a salary from all of the properties, all

2    four properties, or that's your intention going forward is a

3    salary on all four properties until the transition?

4        A.    Yes.

5        Q.    Okay.  And what's the source of funding for that

6    salary?

7        A.    Cash collections.

8        Q.    On what -- on what AR?

9        A.    On the current AR of the facilities.

10        Q.    And what is the status of funding from West

11    Wharton?

12        A.    According to West Wharton yesterday and this

13    morning, everything is fine.  And that should fund on

14    Thursday.

15        Q.    And how much will fund on Thursday?

16        A.    I sent that in today.  It should be somewhere close

17    to $700,000.

18        Q.    And that will be a lump sum payment from West

19    Wharton to the debtors?

20        A.    That's correct.

21        Q.    And then on -- originally on the first payroll when

22    we were here roughly ten days ago on Seguin, you said that

23    you had about $120,000 in cash to use on the Seguin payroll?

24        A.    That's correct.

25        Q.    And that's why you told the Court that the stay

CINDY SUMNER, CSR (214) 802-7196

1    should not be lifted as to Seguin because you could make the

2    Seguin payroll?

3        A.    That's correct.

4        Q.    Did the Seguin payroll money come only from Seguin

5    collections?

6        A.    I do not know the answer to that.

7        Q.    Who would know the answer to that?

8        A.    Well, it would come from me, but I haven't looked

9    at what money was returned from Alleon from the prior day

10    sweeps that it wasn't supposed to sweep, which is what we use

11    to fund that payroll.  So I'd have to go back and look at the

12    bank accounts.  I haven't done that.

13        Q.    Do you know how much money was in the Seguin

14    account as of the date that you filed bankruptcy?

15        A.    I have no idea.  Because all monies were swept

16    from -- when the monies are swept from all of the accounts,

17    Alleon then sends them back into one account.  And then all

18    bills are paid out of one account from all of the monies that

19    are collected across all facilities.  That's the way all

20    healthcare companies have their cash set up.  So there's

21    no -- I have no way of knowing what was in what account on

22    the day we filed bankruptcy.

23        Q.    Okay.  So right, wrong, or indifferent, your

24    testimony today is that the commingling was just kind of

25    built into the system?


                    CINDY SUMNER, CSR (214) 802-7196

1       A.   That's correct.

2       Q.   So if West Wharton does not fund the $700,000 lump

3  sum payment, what's the next source of funding for payroll at

4  Seguin?

5       A.   Our cash collections.  We have roughly 60 percent

6  of payroll funded today with cash on hand.

7       Q.   And when's the next payroll due?

8       A.   Friday.

9       Q.   And that's for all four facilities again?

10      A.   That's correct.

11      Q.   Okay.  But you only -- so payroll has to be funded

12  on Friday --

13      A.   Friday.

14      Q.   -- and you only have 60 percent of what you need --

15      A.   On Tuesday.

16      Q.   -- on Tuesday.

17      A.   So we're in pretty good shape.

18      Q.   All right.  Without West Wharton, are you

19  testifying that you have enough cash collections to make

20  payroll on Friday?

21      A.   On our projection sheet we should be able to fund

22  payroll without the West Wharton funding.  But we're not

23  going to have to do that, because West Wharton has already

24  said that they're funding on Thursday.

25      Q.   Do you have that in writing from West Wharton?


CINDY SUMNER, CSR (214) 802-7196

1    A.    No, I don't.

2    Q.    And when -- when will that be definitive and

3 enforceable against West Wharton?

4    A.    It's sent tomorrow.  They've requested a couple of

5 new documents from us that we haven't provided in the past.

6 So they'll have those by midnight tonight.

7    Q.    What documents are those?

8    A.    They want a split up of the AR by facility.  And

9 historically they only wanted a consolidated split.  Now they

10 want it split by facility.

11    Q.    What's the contingency plan if West Wharton doesn't

12 fund and you don't collect enough between now and Friday?

13    A.    Well, typically in a payroll like Friday, if we

14 have 50 percent of the funds available on Friday, payroll can

15 fund because typically it will take Monday, Tuesday, and

16 Wednesday for the rest of payroll to come in.  So we're

17 usually able to float that payroll until the following week

18 when we have enough cash collections to cover.  And we've

19 done that successfully multiple times.  I don't think it will

20 come to that because we're already doing so well.  But it's

21 hard when you're recovering from a loss of a million dollars

22 that was taken in two weeks.

23         MR. CARRUTH:  Objection; non-responsive.

24    Q.    So the -- so the -- the float is part of the

25 strategy?


                 CINDY SUMNER, CSR (214) 802-7196

1       A.    No.  That's a -- that is the very last choice of

2   the strategies.  So typically what we would do if we don't

3   have funds for full payroll, we have leadership team, the

4   management team holds their checks until the following

5   Monday.

6       Q.   Okay.

7       A.    And we've had to do that several times in the last

8   14 years.

9       Q.   Okay.  So -- okay.  So it's your testimony that you

10  and the other family members are going to get paid last to

11  make sure that this next payroll gets out to the employees?

12      A.    Laurie Beth and I never deposit a check until every

13  other employee has received their check and it has cleared.

14  So typically we don't deposit checks for a week after

15  payroll.  And we've always done it that way.

16      Q.    And if your -- if part of your job is a smooth

17  transition, is that -- that's one of the things that you

18  should continue to do in order to receive money from the

19  bankruptcy estate?

20      A.    100 percent, yes, sir.

21      Q.    And since we're all here right now, does that

22  include PointClickCare access for the Seguin facility?

23      A.    No, sir, it does not.

24      Q.    And why not?

25      A.    Because there's no transfer of ownership of the


                CINDY SUMNER, CSR (214) 802-7196

1    Seguin facility.

2        Q.   Okay.  But if you don't make payroll, who are you

3    going to ask to fund payroll at Seguin or anywhere else?

4        A.   I don't need anybody to fund payroll at Seguin.

5        Q.   I'm sorry, my question, though, was, if you don't

6    have West Wharton money and you don't have collections --

7        A.   I already have collections for payroll Seguin.  So

8    Seguin's fine Friday.  And the stay is not lifted for Seguin.

9    The patient care has been immaculate.  We've had surveyors in

10   that building monitoring for 11 days --

11              MR. CARRUTH:  Objection; non-responsive.

12              THE COURT:  Objection sustained.

13       Q.   My question is --

14              THE COURT:  I need you to just answer the

15   questions proposed to you.

16       Q.   -- if you don't -- if you don't have sufficient

17   collections on Seguin, who are you going to ask to fund

18   payroll again?

19       A.   I already have sufficient collections for Seguin.

20       Q.   I'm sorry, that's not the answer.  That's not the

21   question.  Who are you going to ask to fund payroll if you

22   don't have sufficient collections for Seguin?  Because we've

23   already been through one emergency, so we need to know now

24   what are you going to do?

25       A.   I don't know how to answer your question.  I don't


                    CINDY SUMNER, CSR (214) 802-7196

1  need any further collections to fund payroll for Seguin on

2  Friday.  So I'm not asking anybody to fund payroll on Friday

3  for Seguin.

4       Q.   Who did you ask last time to fund payroll when you

5  didn't have enough money?  Did you ask the Kilgore landlord

6  entities?

7       A.   We negotiated with the landlord to cover payroll,

8  that's correct.  And in return, we are turning the facilities

9  back over to the landlord.

10      Q.   I understand.  But last time you didn't have enough

11  money for Seguin without the other -- without taking from the

12  other properties.

13      A.   I don't know that that's true, counselor.

14      Q.   Okay.  Well --

15      A.   I don't know that that's true.

16      Q.   If you're not -- in the event that you don't have

17  enough money for payroll, because it's already happened once,

18  in the event that you don't have enough money for payroll,

19  shouldn't you provide PointClickCare access for Seguin also

20  to the Kilgore landlords?

21      A.   No, sir.  Because the only reason the landlord

22  wants the Seguin PointClickCare access is in order to

23  transition that property to another provider.

24      Q.   Isn't that what happens if you can't make payroll

25  again?


                CINDY SUMNER, CSR (214) 802-7196

1       A.   I don't foresee us having that problem in the Seguin

2  property.

3       Q.   Not foresee,, if.  You're a fiduciary, I'm asking

4  you what happens if you don't make payroll?  Who takes over

5  the property?  Or who's going to be responsible for payroll?

6       A.   I will be.

7       Q.   You will be?

8       A.   Uh-huh.

9       Q.   Well, you just told -- we just heard that you're

10  living paycheck to paycheck.

11       A.   I am.

12       Q.   Okay.  Then how are you going to make payroll out

13  of pocket when you didn't do it last time?

14       A.   I've already answered this question four times.

15       Q.   No, you haven't.  I'm sorry.

16       A.   I have.

17       Q.   No.  You went to Hawaii two weeks ago.  You didn't

18  make payroll out of pocket, because you were in Hawaii two

19  weeks ago, weren't you?

20       A.   Yes.  For a trip that was paid for a year ago and

21  air flights that were free because my brother-in-law works

22  for American Airlines.

23       Q.   But we're all racing around for an emergency and

24  you're in Hawaii two weeks ago.

25       A.   That's not true.  I was here in this courtroom,


                    CINDY SUMNER, CSR (214) 802-7196

1   counselor.

2               THE COURT:  All right.  Enough.  Enough.

3               MR. CARRUTH:  Thank you, Your Honor.

4         Pass the witness.

5               THE COURT:  You may.

6               <u>CROSS-EXAMINATION</u>

7   BY MS. KLEIN:

8      Q.   Good afternoon, Mr. McPike.  Buffey Klein with

9   Husch Blackwell.  I just have a couple of questions with

10  regard to the funds that you anticipate receiving from West

11  Wharton this week.

12     A.   Yes, ma'am.

13     Q.   You testified that you had submitted an application

14  for these funds or otherwise submitted additional

15  documentation requesting the funds.  Can you give us some

16  more information about what exactly you submitted to West

17  Wharton?

18     A.   Yes, ma'am, I can.

19      We typically submit just the AR aging, just like we

20  submit every month.  They wanted the AR aging broken out by

21  facility, not just consolidated so that they could see each

22  facility's AR that they're forwarding.

23     Q.   Each -- so you broke it down by each individual

24  facility --

25     A.   That's correct.


                CINDY SUMNER, CSR (214) 802-7196

```
 1      Q.    -- by AR?

 2        And can you tell --

 3      A.    Which just runs right out of weekly care.

 4      Q.    Can you tell us how much was apportioned to each

 5  facility?

 6      A.    No.  I don't have that memorized.  It was whatever

 7  the Medicaid receivables are for April 1st.

 8      Q.    How are they typically apportioned amongst the four

 9  facilities?

10      A.    Whatever the April AR is for --

11      Q.    I mean, are they generally equivalent, or are

12  they -- or do you have one facility that typically bills more

13  Medicaid, as opposed to another?

14      A.    Well, it's all built on census.  So whoever has the

15  highest Medicaid census will have the highest Medicaid AR.

16      Q.    Currently which facility, at this time, is -- has

17  the highest census with the most Medicaid AR?

18      A.    I don't remember.  I looked at it this morning.

19  But it would be a guess, if I answered that.  I don't

20  remember.  I was working so fast on it and trying to hurry up

21  and get it done, I don't remember what each building was.  I

22  think Dallas is the least.  But I can't remember the numbers.

23      Q.    So you're receiving funds this week that are due

24  and payable to each of the four facilities?

25      A.    That's correct.  And they'll be allocated that way,
```

CINDY SUMNER, CSR (214) 802-7196

1    by facility.

2         Q.    And they're going to be kept by facility going

3    forward?

4         A.    That's correct.

5         Q.    And this is different than the process that's been

6    undertaken --

7         A.    Correct.  Because we want to make sure we are

8    facilitating a smooth transition where there's very few

9    questions of what goes where and who goes with what.

10        Q.    How much in total have you received from West

11   Wharton?

12        A.    Whatever we testified to last time.  It's a little

13   over 900,000.  We received 300,000 in February and then

14   615,000 or 16,000 in March.

15        Q.    And the 700,000 is related to April?

16        A.    Correct.

17        Q.    And this is pursuant to the management agreements

18   that have been executed --

19        A.    Correct.

20        Q.    -- with West Wharton?

21        A.    Yes, ma'am.

22             MS. KLEIN:  Those are the only questions I

23   have, Your Honor.

24             THE COURT:  Thank you.

25             THE WITNESS:  Thank you.


                    CINDY SUMNER, CSR (214) 802-7196

1              THE COURT:  All right.  Have you not been

2   accounting for your ARs by the debtors?

3              THE WITNESS:  Always.

4              THE COURT:  You have been?

5              THE WITNESS:  Yes, ma'am.  Our AR is

6   always --  it runs right out of our software system by

7   debtor.

8              THE COURT:  Okay.

9              THE WITNESS:  Yes, ma'am.

10              THE COURT:  All right.  So how have you

11   historically accounted for the -- your payroll -- so let me

12   start with you.

13              THE WITNESS:  Yes, ma'am.

14              THE COURT:  It looks like you're being paid,

15   let's see, $9,434; is that right, per month?

16              THE WITNESS:  Yes, ma'am.

17              THE COURT:  And how is that allocated between

18   all of the different debtors?

19              THE WITNESS:  So typically -- so my payroll

20   belongs under the debtor that is the lLC, which is the

21   management company.  And so it's -- it's paid for by the

22   facilities through the management fee that they pay to the

23   LLC for managing the buildings.

24              THE COURT:  Okay.  So in that event, we're not

25   actually talking about wages, we're talking about payment of


                CINDY SUMNER, CSR (214) 802-7196

1   management fees to a non-debtor entity -- related non-debtor

2   entity?

3                    THE WITNESS:  It's the LLC.

4                    THE COURT:  Okay.  Is the LLC a debtor?

5                    THE WITNESS:  Yes, ma'am.

6                    THE COURT:  Which debtor is that?

7                    THE WITNESS:  It's Remarkable Healthcare, LLC.

8                    THE COURT:  Okay.

9                    THE WITNESS:  Yes, ma'am.  And so the payroll

10  for all of the employees that are employed by the LLC, the

11  way the LLC earns its money is through the management

12  agreement that gets paid by the facilities every month.

13                   THE COURT:  Okay.  So how do you allocate

14  between the different LLCs for the management fee?

15                   THE WITNESS:  Again, we made the decision

16  several years ago, maybe even ten years ago, to sweep all the

17  funds into one account where all of the payables get managed

18  out of the one account by the manager, by the LLC.  And so

19  I'm sure that there's a back-office accounting system that

20  does some of that, I'm not -- that's above my area of

21  expertise.

22                   THE COURT:  Well, it's either you or Laurie or

23  Chris would know, right?

24                   THE WITNESS:  No, ma'am.  In the past --

25                   THE COURT:  Between the three of you, you

                    CINDY SUMNER, CSR (214) 802-7196

1  control all of the finances.

2              THE WITNESS:  Prior to filing bankruptcy, we

3  had a CFO her name was Diane McPike, She no longer works for

4  the company.  She -- we still ask her for her assistance on

5  the weekends and the evenings because she has a wealth of

6  knowledge locked in her brain that we haven't all

7  redistributed yet.

8        And that's not a -- that's not a -- that's not a

9  Remarkable Healthcare exclusive.  This is just how we do it.

10  This is the way typically --

11              THE COURT:  Well, you all can do it however

12  you want to.  But in bankruptcy there are obligations under

13  the Bankruptcy Code that you have to actually allocate, these

14  are the debtors.

15              THE WITNESS:  Yes, ma'am.

16              THE COURT:  So what I'm trying to understand

17  is, how have you allocated to each of the different debtors/?

18  And you're saying historically you didn't -- or you think

19  they might have, but you don't know what that is.  But you're

20  going to have to file reports with this Court.

21              THE WITNESS:  Yes, ma'am.

22              THE COURT:  And this is not your first rodeo.

23              THE WITNESS:  No, ma'am.

24              THE COURT:  You all were here in a prior case,

25  right?


                 CINDY SUMNER, CSR (214) 802-7196

1              THE WITNESS:  Yes, ma'am.

2              THE COURT:  And so you know your obligations

3  as debtors and debtors in possession --

4              THE WITNESS:  Yes, ma'am.

5              THE COURT:  -- to provide monthly reporting.

6              THE WITNESS:  That's right.  That's right.

7              THE COURT:  That reporting has to be done on a

8  debtor-by-debtor basis --

9              THE WITNESS:  Yes, ma'am.

10             THE COURT:  -- both of the income to that

11  debtor and expenses paid by the debtor.  What I don't

12  understand is how do you allocate on what would be analogous

13  to corporate GNA --

14             THE WITNESS:  So we have individual GNAs.  I

15  understand your question now.  So we have individual revenue

16  GNAs.  All of our cash collections are done by facility.  And

17  then all of our payables are done by debtor.

18             THE COURT:  So how are you doing your payroll

19  by debtor?  That's what I'm asking.

20             THE WITNESS:  So in the financial statements

21  there's a management fee that gets allocated to the LLC.

22             THE COURT:  How much is the allocation --

23  okay, let me make it simple, okay.

24             THE WITNESS:  Yes, ma'am.

25             THE COURT:  Seguin has whatever receivables it


                   CINDY SUMNER, CSR (214) 802-7196

1    has, right?

2                    THE WITNESS:  Yes, ma'am.

3                    THE COURT:  Okay.  And Seguin has whatever

4    payables it has that's specific to Seguin, right?

5                    THE WITNESS:  Yes, ma'am, that's correct.

6                    THE COURT:  Then there are expenses that cut

7    across all of the different debtors, like your work, right?

8                    THE WITNESS:  Yes, ma'am.

9                    THE COURT:  The services you perform.  And for

10   your services that you're performing for all of the debtors,

11   you are being paid $9,434 a month, approximately?

12                   THE WITNESS:  Correct.  From the LLC payroll.

13                   THE COURT:  So how is that allocated to each

14   of the different debtors that are in my court?

15                   THE WITNESS:  Understood.  It belongs to the

16   LLC debtor.  It doesn't get -- like my salary doesn't get

17   reallocated to the financials -- to the four operating

18   facilities.  It stays within the LLC.  We have employees that

19   carry multiple titles at times.  I don't know that we have

20   any right now.

21                   THE COURT:  Okay.  Hold on.

22                   THE WITNESS:  Yes, ma'am.

23                   THE COURT:  So how does the management company

24   get paid and what is the allocation of the funds that are

25   being paid to the management company?


                    CINDY SUMNER, CSR (214) 802-7196

1                 THE WITNESS:  Got it.  So in the financial

2   statements, depending upon the performance of the facility,

3   the facilities pay a 3 to 5 percent management fee to the LLC

4   every month.  And that's allocated in the financial

5   statements.  And that -- those are the dollars that go to pay

6   the LLC payroll.

7         So each month the financial statement shows the dollars

8   that are allocated to the LLC based on the revenue of the

9   facility for that month.  So if there's $500,000 in revenue,

10  there's a 5 percent management fee.  That 5 percent

11  management fee of the $500,000 is allocated to the LLC.

12                THE COURT:  So you're only on the payroll of

13  the LLC, right?

14                THE WITNESS:  Yes, ma'am.

15                THE COURT:  Okay.  And you're asking for

16  the -- for permission to pay -- make payroll to pay your

17  payroll out of where?

18                THE WITNESS:  Out of the LLC.

19                THE COURT:  Okay.  Anything else for this

20  witness?

21                MR. CARRUTH:  Just briefly, Your Honor, two

22  questions, please.

23                THE COURT:  You may.

24

25                (no omission)


              CINDY SUMNER, CSR (214) 802-7196

1                    <u>RECROSS-EXAMINATION</u>

2    BY MR. CARRUTH:

3        Q.   Mr. McPike, you have received the executed

4    non-disclosure agreements and business association agreements

5    from the Kilgore landlords for each of the four properties,

6    or your counsel has?

7        A.   Yes.

8        Q.   Okay.  And are the books for the debtors in your

9    accounting system, is everything posted and up to date

10   through today?

11       A.   No.

12       Q.   When's the last -- when's the last date that

13   everything was posted and up to date through?

14       A.   I'm not sure.  I don't do the posting.  But those

15   employees post daily.  And we are just now going to work on

16   fourth quarter -- first quarter financials.  So they have

17   payments to post.  They still have invoices to post.  Payroll

18   to upload, specifically in to March so that we can get those

19   financials completed.

20       Q.   Are the January financials completed?

21       A.   They have gone through first runs.  I don't believe

22   they're final yet.

23                MR. CARRUTH:  Pass the witness.

24                THE COURT:  Anything further?

25                MS. RAHN:  Nothing else for the debtor.


                 CINDY SUMNER, CSR (214) 802-7196

1           THE COURT:  All right.  The witness may step

2  down.

3           THE WITNESS:  Thank you, Your Honor.

4           THE COURT:  All right.  Anything further from

5  any of the parties?

6           MR. CARRUTH:  Not in terms of evidence, Your

7  Honor.  Just a brief closing.

8           THE COURT:  I'll hear your closing.

9           MR. CARRUTH:  Thank you, Your Honor.

10      If -- I mean, I think the Court heard a lot in the last

11  few minutes.  But if the -- and I guess the frustrating thing

12  is that there's never any specifics on numbers when there's

13  testimony in this case, or amounts.  But if the concept is to

14  transition the three properties that the stay has been lifted

15  on and that is part of the rationale for payroll, then that

16  ought to be expressly conditioned for the management payroll.

17      And then with respect to the PointClickCare access for

18  Sequin.  Once again, if these two individuals, or three or

19  four individuals, but especially Mr. McPike and Mrs. McPike,

20  they are State fiduciaries being paid by the estate, we don't

21  have specific numbers.  We don't have specific commitments.

22  We don't have certainty that payroll is going to be made,

23  especially on Seguin at this point.  With that in mind,

24  because there are going to be -- or we've had demonstrated

25  emergencies in this case already.  The landlord, for better


CINDY SUMNER, CSR (214) 802-7196

1  or for worse, is probably the backstop in case something

2  happens again.  I don't want to commit to that yet.  But, you

3  know, it seems -- it seems like an obvious place to go.

4      So if they're going to be State fiduciaries, if we're

5  going to have emergencies -- we've had emergencies already.

6  And if they're going to get paid under Court supervision, the

7  PointClickCare access for the Seguin facility ought to be

8  turned on also.  And that ought to be what's conditioned

9  today for -- if any insider payroll is to be had in this

10  case, and if we're going to pay the fiduciaries to be

11  fiduciaries, the PCC access ought to be turned on for Seguin,

12  also, so that we have visibility into that property also in

13  case other emergencies happen, in case we have to come in and

14  take over that also.

15      And that's over and above the fact -- beside the fact

16  that we're the landlord and they owe us $3 million any way.

17  But -- and Mr. Kilgore has explained, I think, to the Court

18  one or more occasions that he has that access all over the

19  place.  The hang up to date has always been -- and I think

20  the Court heard this in the last case.  The Court has heard

21  some of that in this case.  The hang up on PCC access so far

22  has been, well, the BAA and the NDA.  Well, those were

23  signed.  They were sent back.  And then access was turned on

24  for the other three properties.  That's not an issue then.

25  So the PCC access for Seguin ought to be turned on also, if

CINDY SUMNER, CSR (214) 802-7196

1    they're going to get paid anything at this point.

2         Thank you.

3              MS. KLEIN:  Your Honor, if I may just briefly.

4    On behalf of Alleon Capital, Buffey Klein.

5         The testimony today, I think, is of -- is concerning

6    for a couple of reasons.  And I think that what has been --

7    and what I believe will continue to be concerning is the

8    commingling of funds and how they've been able to make

9    payroll across the facilities by utilizing funds from each

10   one.  I think what we have not heard is going forward.  And I

11   understand that is not necessarily the issue for today.  But

12   I do believe we need some more specificity from the debtors

13   on exactly how they intend to operate the facilities as

14   independent functioning facilities and maintaining their

15   ability to meet payroll at each of those independent of the

16   others.

17        I don't believe we've heard -- and I think especially

18   the testimony today did not provide any clarity to -- to the

19   creditors as to how that was going -- how that was going to

20   be undertaken or how it's been going on previously,

21   especially with regard to the Seguin facility itself.  And I

22   think that our concern is going forward making certain that

23   that is provided to the creditors and more clear for the

24   Court as to exactly how these facilities are functioning

25   independently, how they're funding the management company,


              CINDY SUMNER, CSR (214) 802-7196

1  and how each of these debtors are operating as independent

2  companies.

3              THE COURT:  Okay.  Is 5 percent of revenues,

4  is that outside the norm?

5              MS. KLEIN:  Your Honor, as far as the norm on

6  a management fee --

7              THE COURT:  For a management company.  I

8  thought --

9              MS. KLEIN:  I think the management agreement

10  with West Wharton provides for that type of a fee.

11              THE COURT:  Okay.

12              MS. KLEIN:  I don't know that that's abnormal.

13  But I don't know that, again, we've seen how individual --

14  these individual facilities are able to actually accomplish

15  payment of that fee, either.

16              THE COURT:  Well, they're all paying 5 percent

17  of their revenues, right?  That's what he's suggested.  Am I

18  misunderstanding the testimony?

19              MS. KLEIN:  I, again, I don't believe that we

20  heard how each of those facilities were able to make their

21  independent payroll and also pay that 5 percent fee.

22              MR. CARRUTH:  Well, Your Honor --

23              THE COURT:  Well, they're not paying their

24  landlords, I'm sure that's what you're getting ready to say.

25              MR. CARRUTH:  Amen, Your Honor.  Thank you.


                   CINDY SUMNER, CSR (214) 802-7196

1            THE COURT:  Okay.  He says that at every

2  hearing, so that's why I knew what he was going to say when

3  he got up.  Okay.  And there's no dispute about that.

4      Okay.  So here we are.

5            MS. RAHN:  Your Honor, may I say something?

6            THE COURT:  Yes, ma'am, I'll hear your

7  closing.

8            MS. RAHN:  So as you heard landlord and

9  landlords' counsel has made it clear that the McPikes are

10  necessary for this transition to the new operator.  And if

11  they're needed right here/right now, but they're not going to

12  get paid, they don't really have the time necessary to go out

13  and get a job where they can be paid and continue to be the

14  fiduciaries that these estates -- they're expected to be.

15  And this is why generally debtors pay in the ordinary course

16  of business the salaries of their employees to keep them

17  onboard, especially since landlord has admitted that the

18  McPikes are necessary to a smooth transition.

19            THE COURT:  Okay.  So here's what we're going

20  to do, okay.  First, the debtor needs to make sure that the

21  landlord has the PointClickCare access provided that -- to

22  Seguin facility.  Provided that the landlord gets that

23  access, the debtor may make their management fee payments to

24  the LLC and the LLC is thereafter authorized to pay

25  pre-petition wages to the insiders.  And the Court is also


                    CINDY SUMNER, CSR (214) 802-7196

1  approving the prior payments to all other employees as

2  authorized by the Court at the interim hearing on a final

3  basis.  The Court is doing that in part because the amount to

4  be paid to each of the insiders, that being Laurie Beth

5  McPike, Jon McPike, and Chris McPike is less than the

6  priority amounts of their wage claims.  And so they would be

7  entitled to be paid on a priority basis any way.  Okay.

8  So I'm going to authorize that.

9       But I need you all to make sure that the payments are

10  coming from the proper source.  The testimony was he gets

11  paid from the management company, from the LLC.  And so they

12  can get paid from the LLC.  And they're entitled to charge

13  their 5 percent to the debtor so that money can flow to the

14  LLC in the ordinary course of business and they can get paid

15  from that.  That way we don't have to worry about allocating

16  each of the management personnel to the various debtors, at

17  least not yet.  Maybe there will come a time in the future we

18  will need to do that.  But that payment can be made after

19  they get PointClickCare access, okay.

20       So -- and, of course, the landlord has to deliver

21  appropriate non-disclosure and other documents consistent

22  with what they've done with the other facilities, or are

23  doing with the other facilities.  Those need to be signed

24  immediately.  Okay?

25            MS. RAHN:  Your Honor, we also emailed with,


            CINDY SUMNER, CSR (214) 802-7196

1   Kayla, your Court Clerk, about our motion for extending the

2   deadline to file the schedules.  And we conferred with the

3   U.S. Trustee on an extension to April 16th because we've been

4   putting out fires and dealing with the transition and haven't

5   had a chance to --

6           THE COURT:  When's the 341 Meeting?

7           MS. RAHN:  It's April 22nd.  So we spoke with

8   the Trustee and that gives three full business days prior to

9   the 341 Meeting.

10          THE COURT:  Okay.  Is there any objection to

11  that that you all want a hearing for some reason?

12          MR. CARRUTH:  No objection, Your Honor.

13          MS. KLEIN:  No objection, Your Honor.

14          THE COURT:  Okay.  You can submit an order

15  consistent with your agreement with the U.S. Trustee.  But

16  make sure that the form of order notes that the U.S. Trustee

17  has agreed.  Okay?

18          MS. RAHN:  Yes.  Yes, Your Honor.

19          THE COURT:  Thank you.

20      All right.  Anything else for today?

21          MR. CARRUTH:  Your Honor, a bit of

22  housekeeping.

23      I think on Thursday this week, April 4, we have a

24  hearing on the DIP, the emergency DIP for the payroll.  And

25  then we have a hearing on the 8th, also.  We probably need to

CINDY SUMNER, CSR (214) 802-7196

1   get something on -- or I might need to get something on file.

2   But I think it would probably make more sense to move the 4th

3   to the 8th, or the other hearings on the 8th, if possible.

4              THE COURT:  Do you all want that to wait until

5   the 8th?  We're talking about payroll, right, or the DIP

6   for -- you've already made the payroll --

7              MR. CARRUTH:  Yeah, yeah, it's for that one.

8              THE COURT:  Yeah.  If you all -- if you all

9   agree to continue it to the 8th, we can continue it to the

10  8th.  We just need to notice it out.

11             MR. CARRUTH:  Okay.  All right.  Is that --

12             MS. RAHN:  I'm checking schedules.

13             MR. CARRUTH:  I mean, I think we already

14  have --

15             MS. RAHN:  Oh, we're already on the docket.

16  Then, yeah that's --

17             MR. CARRUTH:  Now, you know, things may happen

18  and we may be back here on the 4th any way.  But for the one

19  that's already happened, I still need to finish paperwork

20  with debtor.

21             THE COURT:  What exactly do you mean, things

22  may happen and you might be here any way?

23             MR. CARRUTH:  Well, I mean, if there's another

24  emergency, we may have to come back on another DIP.  That's

25  all I'm saying.  But I'm not --


              CINDY SUMNER, CSR (214) 802-7196

1               THE COURT:  Well, then we would -- you'd have

2   to file your motion and we'd have to set it, right?  Because

3   if I'm going to take it off the docket right now, I'm getting

4   ready to instruct my courtroom deputy to --

5               MR. CARRUTH:  Yes, Your Honor.  The existing

6   DIP I'd like to move to the 8th, please.

7               THE COURT:  Okay.  It can be continued to the

8   8th.  And then you can submit the -- but you need to notice

9   it out that it's being continued to the 8th.

10              MR. CARRUTH:  Yes, Your Honor.

11              THE COURT:  And then, yeah, if there's

12  anything else filed, you're going to have to request a

13  hearing because I'm freeing that time up for other matters.

14              MR. CARRUTH:  Yes, Your Honor, understood.

15              THE COURT:  Anything else?

16              MR. CARRUTH:  No, for us.

17              THE COURT:  Thank you.

18              MR. CARRUTH:  Thank you.

19              THE COURT:  All right.  Parties are excused.

20                  (End of Proceedings.)

21

22

23

24

25


                CINDY SUMNER, CSR (214) 802-7196

1                    C E R T I F I C A T E

2           I, CINDY SUMNER, do hereby certify that the

3    foregoing constitutes a full, true, and complete

4    transcription of the proceedings as heretofore set forth in

5    the above-captioned and numbered cause in typewriting before

6    me.

7

8

9

10

11

12

13

14                              /s/Cindy Sumner

15              _____

16                    CINDY SUMNER, CSR #5832
                     Expires 10-31-2024
17                    Cindy Sumner, CSR
                     5001 Vineyard Lane
18                    McKinney, Texas 75070
                     214 802-7196
19

20

21

22

23

24

25


                    CINDY SUMNER, CSR (214) 802-7196